**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Adoption of H.N.R.*, Slip Opinion No. 2015-Ohio-5476.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-5476

IN RE ADOPTION OF H.N.R.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Adoption of H.N.R.,* Slip Opinion No. 2015-Ohio-5476.]**

*Adoption—Putative Father Registry—R.C. 3107.07(B)(1) and 3107.062— Procedural due process—As-applied challenge to putative-father-registry deadline—Putative father was not injured by aspect of statute he alleges is unconstitutional—Where there is no prejudice to the party allegedly wronged by a statute, the party cannot call upon the court to conduct an as-applied constitutional analysis.*

(No. 2014-2201—Submitted June 24, 2015—Decided December 31, 2015.)

APPEAL from the Court of Appeals for Greene County,

No. 2014-CA-35, 2014-Ohio-4959.

_____

**O'CONNOR, C.J.**

{¶ 1} Appellant, C.S.M., brings an as-applied challenge to the constitutionality of an aspect of Ohio's Putative Father Registry ("OPFR") that

limits the time frame during which a man can register as a putative father in order to gain a right to receive notice of any subsequent adoption proceedings involving the man's putative child. *See* R.C. 3107.07(B)(1) and 3107.062. C.S.M. argues that the deadline—30 days after the child's birth in the version of the law that applied to C.S.M, since reduced by the legislature to 15 days—is unconstitutional as applied to the putative fathers of children who are relinquished for adoption more than 30 days after birth. He argues that putative fathers have a due process right to the opportunity to register with the OPFR at any point prior to the initiation of a child's adoption proceedings and that the 30-day deadline arbitrarily curtails this right.

{¶ 2} Although the legislative policy behind the 30-day deadline gives us pause, C.S.M. failed to utilize any of the legal processes available to secure his rights as a putative or legal father at any point prior to the initiation of H.N.R.'s adoption proceedings. He therefore is outside the class of persons he alleges are prejudiced by the statutory limitation. Because C.S.M. cannot demonstrate that he was injured by the application of the statutory putative-father-registration deadline, we affirm the judgment of the Second District Court of Appeals.

### RELEVANT BACKGROUND

{¶ 3} H.N.R. was born on August 29, 2013, at a hospital in Huntington, West Virginia.[1] No father is listed on H.N.R.'s birth certificate. The mother and H.N.R. resided in Chesapeake, Ohio, and C.S.M. resided in West Virginia. On September 17, 2013, both the mother and C.S.M. submitted to a DNA test, which indicated a 99.99 percent probability that C.S.M. was H.N.R.'s biological father.

---

[1] Although H.N.R. was born outside of Ohio, it is undisputed that H.N.R. resided solely in Ohio and that no legal action was attempted by C.S.M. in the courts of West Virginia. Ohio is therefore H.N.R.'s "home state" as defined by both Ohio's and West Virginia's codifications of the Uniform Child Custody Jurisdiction and Enforcement Act. R.C. 3127.01(B)(7); W.Va.Code Ann. 48-20-102(g). Jurisdiction over H.N.R. is properly within the Ohio court system. R.C. 3127.15(A)(1); W.Va.Code Ann. 48-20-201(a). *Compare In re Adoption of Asente*, 90 Ohio St.3d 91, 734 N.E.2d 1224 (2000); *Rosen v. Celebrezze*, 117 Ohio St.3d 241, 2008-Ohio-853, 883 N.E.2d 420.

**{¶ 4}** The mother signed a permanent surrender of H.N.R. to an adoption agency in January 2014. On January 16, 2014, the agency submitted an application to the Ohio Department of Job and Family Services ("ODJFS") to search the Ohio Putative Father Registry. ODJFS searched the registry and verified that no putative father was registered in relation to H.N.R. or the mother.

**{¶ 5}** On February 11, 2014, in the Greene County Probate Court, prospective adoptive parents filed a petition to adopt H.N.R. The social- and medical-history form filed with the adoption petition provided some basic physical attributes of the unnamed father, but all other details about the father were marked "don't know." The ODJFS Prefinalization Adoption Assessment Report, filed in June 2014, stated that the unnamed father "was aware of the pregnancy but chose not to participate in making an adoption plan. He did not provide emotional, financial or physical support to the birthmother [sic] during the pregnancy or the first four months of [H.N.R.]'s life * * *."

**{¶ 6}** Approximately two months after the petition to adopt H.N.R. was filed, C.S.M. filed complaints for custody with the Greene and Lawrence County Juvenile Courts, and on April 25, 2014, he filed a motion to intervene as a necessary party to H.N.R.'s adoption proceedings in the Greene County Probate Court. C.S.M. asserted that his consent for H.N.R.'s adoption was required because he is the biological father and because the mother secretly relinquished the child for adoption despite knowing the father's identity and whereabouts. He further asserted that the probate court was obligated to defer to the juvenile court on the issue of H.N.R.'s parentage and that the adoption proceedings therefore must be stayed pending the resolution of C.S.M.'s custody complaint. The probate court stayed the adoption case, and the prospective adoptive parents filed a motion for a protective order, to remove the stay, to strike or deny the motion to intervene, and to enter a judgment finding that C.S.M.'s consent to the adoption was not required.

{¶ 7} The probate court held a hearing to allow the parties to further explain their legal positions on C.S.M.'s standing and the significance of his juvenile-court filings. The parties primarily debated whether it was the identity of the court or instead the timing of the parties' filings that determined which court—probate or juvenile—could properly exercise jurisdiction over a child's parentage and adoption proceedings pursuant to *In re Adoption of Asente*, 90 Ohio St.3d 91, 734 N.E.2d 1224 (2000), *In re Adoption of Pushcar*, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, and *In re Adoption of G.V.*, 126 Ohio St.3d 249, 2010-Ohio-3349, 933 N.E.2d 245.

{¶ 8} Notably, C.S.M. also raised a new argument at the hearing disputing the fairness of requiring his compliance with the OPFR deadline in order to qualify for notice of H.N.R.'s adoption proceedings. Over the prospective adoptive parents' objection, C.S.M. took the stand to explain why he had not registered as a putative father.

{¶ 9} C.S.M. stated that he had been in a relationship with the mother throughout the pregnancy and was present at the hospital for H.N.R.'s birth. However, C.S.M. accused the mother of having had sexual relations with other men, and she agreed to conduct the DNA test that later confirmed that C.S.M. was H.N.R.'s biological father. C.S.M. stated that he then saw no need to register as a putative father because he already knew that H.N.R. was his biological child and he believed that he and the mother would get married.

{¶ 10} C.S.M. alleged that during the first four months of H.N.R.'s life, he spent time with the child "[p]robably once every couple of weeks." C.S.M. alleged that during the next two months he had no contact with the child because the mother would not answer the door when C.S.M. came to her house. C.S.M. stated that at some point during or after this two-month period, the mother allegedly told C.S.M. that H.N.R. was dead. Eventually, the mother informed C.S.M. that she had given

H.N.R. up for adoption. C.S.M. obtained counsel and filed custody actions, but by that point, adoption proceedings were already pending.

{¶ 11} The prospective adoptive parents moved the trial court to strike C.S.M.'s testimony, and because they believed that C.S.M. should not have been permitted to testify at the hearing, they declined cross-examination. Alternatively, they moved to schedule an evidentiary hearing in order to allow both sides to appropriately present evidence regarding the actions of the mother and C.S.M. prior to the initiation of adoption proceedings. The trial court noted that C.S.M.'s testimony might not be relevant to the legal issues to be decided and assured the adoptive parents that an additional hearing would be held if the court were to later decide that the testimony was relevant. The trial court offered the parties the opportunity to submit posthearing briefs, but only the prospective adoptive parents did so.

{¶ 12} The trial court entered judgment denying all relief requested by C.S.M. and ordering that the adoption proceedings should continue without his participation. The trial court determined that pursuant to *Asente*, the sequence of filing events was dispositive, and because the adoption petition was the first action filed regarding H.N.R., the probate court had exclusive jurisdiction that was not affected by C.S.M.'s later-filed custody actions in the juvenile courts. Next, the trial court held that C.S.M. did not have standing to intervene in the adoption proceedings, as he had admittedly failed to register as a putative father as described in R.C. 3107.07(B)(1) and failed to timely pursue the various alternative legal avenues to establish a parent-child relationship provided by the legislature in R.C. 3111.02(A). The trial court acknowledged that C.S.M. had raised a general argument that the inability to intervene violated his constitutional rights, but because C.S.M. had offered no legal authority in support of that argument, the trial court rejected it.

{¶ 13} In C.S.M.'s appeal to the Second District Court of Appeals, his arguments focused solely on R.C. 3107.07(B)(1). He asserted that the statute violated due process as applied to fathers who are too distracted with the care of their newborn children and the children's mothers during the first 30 days of the children's lives to be expected to consider the need for legal protections. He contended that the 30-day-post-birth registration deadline of R.C. 3107.07(B)(1) arbitrarily deprived him of the opportunity to register as a putative father at any point up to the filing of the adoption petition. C.S.M. additionally argued that the state's failure to promote awareness of the OPFR created an exception to the maxim that ignorance of the law excuses no one and that his ignorance of the OPFR was instead a ground for relief.

{¶ 14} The appellate court overruled C.S.M.'s awareness-promotion argument on the ground of waiver. To the extent that C.S.M. intimated that his substantive due process rights were violated by R.C. 3107.07(B)(1) because he had a fully established parent-child relationship with H.N.R., the court rejected his argument as unsupported by C.S.M.'s own factual allegations. Finally, the court noted that C.S.M.'s more specific procedural argument against R.C. 3107.07(B)(1) would have no effect on his case because he made no effort to protect his legal rights until after the adoption petition had already been filed. The appellate court therefore affirmed the trial court's rulings that C.S.M. was not entitled to notice of H.N.R.'s adoption proceedings and that his consent was not required for the adoption of H.N.R.

{¶ 15} C.S.M. now appeals the decision of the Second District to this court and presents the following proposition of law:

The 30-day post-birth deadline for filing in the putative father registry under R.C. 3107.07(B)(1) is unconstitutional as applied to

putative fathers of children surrendered for adoption after the filing deadline passes.

## ANALYSIS

### *Statutory Scheme Governing Putative Fathers*

{¶ 16} Adoption is governed by R.C. Chapter 3107.  In order to adopt a child in Ohio, the consent of certain parties might be required, including (1) a father who was married to the mother at the time of the conception or birth of the child, (2) a father who has established legal paternity through a court action, (3) a father who has established legal paternity through administrative proceedings, (4) a father who has established legal paternity by processing an acknowledgement of paternity, signed by both the father and mother, and (5) under certain conditions, a putative father.  R.C. 3107.06(B), (C).  A putative father is simply a man who might be a child's biological father but who has no legal relationship with the child through marriage to the mother or the establishment of legal paternity.  R.C. 3107.01(H).

{¶ 17} Registering as a putative father is relatively simple.  At the time he engages in sexual intercourse, a man is considered to be on notice of the potential biological and ensuing legal consequences of that intercourse.  R.C. 3107.061. From that point forward, he can register as a putative father by filling out a short form on a webpage maintained by ODJFS or by mailing the same information to ODJFS.  Ohio Adm.Code 5101:2-48-02(C).  A man can register in the OPFR "at any time," but the law applicable during the time frame at issue in this case provided that he must register not more than 30 days after the birth of the child "[f]or the purpose of preserving the requirement of his consent to an adoption."  Former R.C. 3107.062, 2012 Am.Sub.H.B. No. 279; *see also* former R.C. 3107.07(B)(1), 2008 Sub.H.B. No. 7.[2]

---

[2] Amendments to R.C. 3107.062 and R.C. 3107.07, effective March 23, 2015, reduced the registration period from 30 to 15 days.  2014 Sub.S.B. No. 250.

**{¶ 18}** In order for a putative father who has timely registered in the OPFR to attain the status of one whose consent is required for an adoption, (1) pursuant to R.C. 3107.07(K), he must also file an objection within 14 days after he has been given notice of the filing of an adoption petition, (2) he must participate in a hearing on the adoption petition as provided in R.C. 3107.11, and (3) at that hearing, under R.C. 3107.06(B)(2), the court must find that he is the father of the child and that he did not willfully abandon the child or the mother during the pregnancy or during any period prior to the surrender and/or placement of the child for adoption.

**{¶ 19}** The nature of these conditions is such that each one must be satisfied chronologically in order for the next condition to arise. The failure to satisfy any one of the conditions brings the putative-father process to an end. However, separate from this process, a father still has the option of securing the right to receive notice of the filing of an adoption petition and the right to withhold consent to an adoption by establishing legal paternity through court or administrative proceedings, which do not have the same 30-day time limitation. *See* R.C. 3111.01 et seq.; R.C. 3111.38 et seq. But a man's failure to timely register in the OPFR precludes him from receiving notice and an opportunity to prove that his consent as a mere putative father should be required for a child's adoption. *See* R.C. 3107.07(B)(1), 3107.11(A)(1).

### *An As-Applied Due Process Challenge*

**{¶ 20}** C.S.M. contends that the General Assembly's choice of a 30-day registration deadline for putative fathers is reasonable in the context of adoption petitions filed at the time of a child's birth but arbitrary and irrational in the context of adoption petitions filed more than 30 days after birth. He argues that in the latter context, disallowing fathers to register up to the date of the adoption petition does not serve the state's interest in expediting the adoption process, substantially affects a father's interest in developing a relationship with his child, and risks erroneously

depriving many responsible fathers of that interest by closing off the opportunity before an involved father would reasonably be expected to act.

{¶ 21} It is clear that C.S.M.'s argument is not aimed at Ohio's statutory scheme governing adoption, or even the statutory scheme governing putative fathers, as a whole, but only at the 30-day-post-birth deadline provided in former R.C. 3017.07(B)(1) and former R.C. 3107.062 as applied to his specific circumstances. Thus, we are not presented with a broad-based, facial due process challenge to Ohio's adoption laws, but instead a discrete, as-applied due process challenge to one of the several specific procedures that the General Assembly has provided to protect C.S.M.'s interests as a putative father.

{¶ 22} Because C.S.M.'s challenge to R.C. 3107.07(B)(1) is as-applied, it would be inappropriate to consider applications of the statute to the hypothetical circumstances of the "many responsible putative fathers" whom C.S.M. posits could be unduly prejudiced by the statute. Unlike a court's analysis of facial constitutional challenges, which may involve the consideration of a variety of real and hypothetical circumstances in order to determine whether a statute is unconstitutional under all circumstances, *see United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the focus of our analysis is much narrower.

{¶ 23} We must base our analysis exclusively on the circumstances of the case before us and not on any hypothetical scenarios under which the statute might be unconstitutionally applied. *See generally Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 38; *Palazzi v. Estate of Gardner*, 32 Ohio St.3d 169, 512 N.E.2d 971 (1987), syllabus; s*ee also Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 85 L.Ed.2d 1416 (1941). We therefore consider C.S.M.'s due process argument solely as applied to his specific circumstances.

### *Procedural Due Process*

**{¶ 24}** The Fourteenth Amendment to the United States Constitution provides that the state shall not deprive any person of life, liberty, or property without due process of law. Though it uses slightly different language, Article I, Section 16 of the Ohio Constitution provides the same guarantee. *See Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544-545, 38 N.E.2d 70 (1941).

**{¶ 25}** "Due process demands that the state provide meaningful standards in its laws." *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 81. At its most basic level, due process requires protection against arbitrary laws. *Sacramento Cty. v. Lewis*, 523 U.S. 833, 845-846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). To satisfy the requirements of procedural due process, the means employed by a statute must have a real and substantial relation to the object to be obtained, and its methods must not be unreasonable, arbitrary, or capricious. *Nebbia v. New York,* 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *see also Mominee v. Scherbarth*, 28 Ohio St.3d 270, 274, 503 N.E.2d 717 (1986). Determining whether a particular procedure is constitutionally adequate generally requires a court to analyze and balance three different factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We must first properly frame the private and governmental interests involved.

***The Competing Private and State Interests***

**{¶ 26}** C.S.M. correctly states that the private interest involved in his case is the "opportunity" interest that a putative father has in developing a parent-child relationship. *See Lehr v. Robertson*, 463 U.S. 248, 263-265, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). This interest is far different from the fundamental liberty interest in raising one's children, which is afforded strong constitutional protections only upon the establishment of a parent-child relationship. *See id*. at 256-262, discussing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), and *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," *Caban,* 441 U.S., at 392, his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he "act[s] as a father toward his children." *Id.,* at 389, n. 7. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds.

(Brackets sic.) *Lehr* at 261. C.S.M. strongly insinuates that greater constitutional protections might be at play in his case, particularly through his emphasis on the impact of R.C. 3107.07(B)(1) on "responsible" fathers. However, it remains true that the only interest at issue here is C.S.M.'s inchoate interest in developing a relationship with H.N.R. in the future. This interest, arising solely from a biological link with the child, is afforded far less constitutional protection than an already developed parent-child relationship would be. *Lehr* at 261.

{¶ 27} The state's interest is determined through its intent in enacting the legislation at issue. *See State ex rel. Evans v. Moore*, 69 Ohio St.2d 88, 91, 431 N.E.2d 311 (1982); *see also Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258-259, 262, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) (ascertaining the government's interest through the legislative history of a statute); *Lehr* at 263-265, fn. 20 (identifying the state's interest from a legislative drafting report describing the purpose of the statutory amendments in question); *Hamdi v. Rumsfeld*, 542 U.S. 507, 517, 531, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (identifying governmental interests from the language of the statute in question).

{¶ 28} The OPFR was created in 1996 when the General Assembly enacted Am.Sub.H.B. No. 419, which substantially altered previously existing adoption statutes. 146 Ohio Laws, Part III, 4660. In general, Ohio's adoption statutes relating to putative fathers are the result of the legislature's effort to balance a biological father's interest in having an opportunity to develop a relationship with his child against the state's interest in protecting the best interests of children. *In re Adoption of Zschach*, 75 Ohio St.3d 648, 650-651, 665 N.E.2d 1070 (1996). If adoption is necessary, a child's best interests are best served by ensuring that the adoption process proceeds quickly, so that the child may attain a permanent and stable family environment. *See id.* at 652.

{¶ 29} The stated intent behind the creation of the registry and the inclusion of a 30-day registration deadline was to streamline the long and complicated process leading to the finalization of an adoption and to prevent unnecessary interruptions to the process caused by putative fathers belatedly attempting to exercise their rights. *See In re Adoption of P.A.C.*, 126 Ohio St.3d 236, 2010-Ohio-3351, 933 N.E.2d 236, ¶ 56 (Cupp, J., dissenting), citing 64 Ohio Report No. 215, Gongwer News Service, Inc. (Nov. 9, 1995) 6, and 64 Ohio Report No. 198, Gongwer News Service, Inc. (Oct. 17, 1995) 1.

**{¶ 30}** In the context of adoption petitions that are filed prior to a child's birth or less than 30 days after a child's birth, it is clear that the 30-day OPFR deadline serves the interests articulated by the legislature. In such cases, after an adoption petition has been filed, one of the many waiting periods that must be endured is the 30-day-post-birth waiting period before a search of the OPFR can be performed. *See* former R.C. 3107.064(A), Am.Sub.S.B. No. 180, 148 Ohio Laws, Part V, 9918.[3] Lengthier or more open-ended limitations on putative fathers would leave the rights of the parties to a pending adoption in a state of uncertainty and would impede the adoption process that had already begun.

### No Erroneous Deprivation under the Facts

**{¶ 31}** From our foregoing review of the competing private and governmental interests at stake, we might be left to decide the matter almost solely through the second element of *Mathews*, which would question whether the registration deadline of 30 days, rather than an adoption-filing deadline, might arbitrarily deprive C.S.M. of his interest in the opportunity to establish a legally recognized parent-child relationship with H.N.R. However, the undisputed facts of C.S.M.'s case render that consideration impossible because an application of the later deadline would have no effect on the outcome of his belated intervention.

---

[3] The version of R.C. 3107.064(A) in effect at the time of H.N.R.'s adoption petition provided that

> a court shall not issue a final decree of adoption or finalize an interlocutory order of adoption unless the mother placing the minor for adoption or the agency or attorney arranging the adoption files with the court a certified document provided by the department of job and family services [of the search results of the OPFR]. The court shall not accept the document unless the date the department places on the document pursuant to that section is thirty-one or more days after the date of the minor's birth.

Effective March 23, 2015, amendments to the statute reduced the limitation from 31 to 16 days. 2014 Sub.S.B. 250.

**{¶ 32}** Under an as-applied due process challenge, the challenger must demonstrate that there was an actual—not hypothetical—violation of his constitutional rights:

> The constitutionality of a state statute may not be brought into question by one who is not within the class against whom the operation of the statute is alleged to have been unconstitutionally applied and who has not been injured by its alleged unconstitutional provision.

*Palazzi*, 32 Ohio St.3d 169, 512 N.E.2d 971, at syllabus; *see also Plymouth Coal Co. v. Pennsylvania*, 232 U.S. 531, 544-545, 34 S.Ct. 359, 58 L.Ed. 713 (1914) ("one who would strike down a state statute as violative of the Federal Constitution must show he is within the class with respect to whom the act is unconstitutional, and must show that the alleged unconstitutional feature injures him, and so operates as to deprive him of rights protected by the Federal Constitution").

**{¶ 33}** *Palazzi* provides an example of this principle that is directly applicable to the case at hand. In that case, a named beneficiary in a will was not notified when the will was admitted to probate in January 1967, despite the executor's knowledge of the beneficiary and his whereabouts. The beneficiary was not a resident of Ohio, and at the time of the probate admission, Ohio law required that notice be given only to Ohio residents.[4]

**{¶ 34}** On April 29, 1985, the beneficiary filed an action to contest the validity of the will. Pursuant to the version of R.C. 2107.76 in effect at that time, the opportunity to contest the validity of a will expired four months after the will was admitted to probate. Am.Sub.S.B. No. 466, 136 Ohio Laws, Part I, 999. The

---

[4] The statute containing the notice provision, R.C. 2107.13, was repealed in 1990. 118 Am.Sub.H.B. 346, 143 Ohio Laws, Part III, 4512.

beneficiary claimed that he had not learned of the testator's death until some unspecified point in 1984, and he argued that the failure to provide him with notice violated his procedural due process rights such that he should be permitted to contest the will belatedly.

{¶ 35} We noted that the constitutionality of R.C. 2107.13 was certainly questionable in the context of the executor's actions, or inactions, with respect to the beneficiary. *Palazzi*, 32 Ohio St.3d at 175, 512 N.E.2d 971. But because the beneficiary did not specify exactly when in 1984 he became aware of the will's admission to probate, and because he did not allege that his will contest was filed within four months of that date, we concluded that he "failed to allege facts that would place him within the class injured by any unconstitutional feature of the Probate Code." *Id*. at 174. We concluded that when there is no prejudice to the party allegedly wronged by a statute, the party cannot call upon the court to conduct an as-applied constitutional analysis.

{¶ 36} We must reach the same conclusion here. C.S.M. did not allege to the probate court that he was aware of the OPFR prior to H.N.R.'s adoption petition and that he would have registered but for the futility of the act, nor did he allege that he had made any attempts to establish legal paternity through acknowledgment, administrative, or court proceedings prior to the filing of the adoption petition regarding H.N.R. Despite his knowledge of the mother's pregnancy and of H.N.R.'s birth, C.S.M. admittedly took no action to preserve his rights or even ascertain the legal mechanisms that were available until *after* the filing of the adoption petition. On these facts, we cannot say that C.S.M. was prejudiced by the fact that his opportunity to register in the OPFR did not extend up to the date that the adoption petition was filed. And because C.S.M. was not injured by the aspect of R.C. 3107.07(A)(1) that he alleges is unconstitutional, his argument under the erroneous-deprivation element of *Mathews* is merely hypothetical. Though in this court's estimation, the policy behind a 30-day (or 15-day) registration deadline

appears to be questionable in the context of an adoption petition that is filed well past the 30-day deadline, we cannot fully address the question of its constitutionality under the circumstances presented herein. And we decline to provide an advisory opinion on the constitutionality of R.C. 3107.07(B)(1) and 3107.062 based on hypothetical injuries that might exist outside the specific context of this case.

## CONCLUSION

{¶ 37} C.S.M.'s position is not an unsympathetic one. It may be understandable for a layperson to believe that the completion of a DNA test is all that one would need to prove his fatherhood to the world. But under the legal standards that we must apply, C.S.M. did not take sufficient action to protect his legal rights or to support his constitutional challenge. Therefore, he was not able to demonstrate the requisite prejudice to allow this court to determine whether R.C. 3107.07(A)(1) is unconstitutional as applied to putative fathers of children who are relinquished for adoption more than 30 days after birth.

{¶ 38} With no prejudicial error in the record, the judgment of the court of appeals must be affirmed.

Judgment affirmed.

PFEIFER, O'DONNELL, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

O'NEILL, J., dissents.

_____

**O'NEILL, J., dissenting.**

{¶ 39} While I agree with most of the majority's opinion in this case, I disagree with a critical aspect of its analysis and, therefore, I respectfully dissent. I concur that the issue before us is a very narrow one: whether the putative-father statutes are unconstitutional as applied to the father in this case, C.S.M. During the time period relevant here, former R.C. 3017.07(B)(1) and former R.C. 3107.062 set forth a deadline of 30 days after a child's birth for a man to register in Ohio's

Putative Father Registry in order to gain the right to receive notice of any subsequent adoption proceedings. 2012 Am.Sub.H.B. No. 279; 2008 Sub.H.B. No. 7. The specific question in this case is whether the 30-day-post-birth deadline, as applied to C.S.M.'s circumstances, violates his constitutional right to due process and his fundamental right to parent his own child.

{¶ 40} As the majority recognized, citing *Sacramento Cty. v. Lewis*, 523 U.S. 833, 845-846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), due process provides protection against arbitrary laws. And the universally recognized essence of due process is the right to be heard in a meaningful way before the state, under any circumstances, deprives a fundamental right. Is the 30-day-post-birth deadline arbitrary as applied to C.S.M.? The answer is yes. Does its application in this case deprive him of a fundamental right without due process? Again, the answer is yes.

{¶ 41} Ohio's selection of the day that a child reaches 30 days of age as the deadline by which the child's putative father must register or forfeit his right to receive notice of adoption proceedings that will permanently determine the custody of his child is, by definition, arbitrary. That date is not related to any significant event in the life of the child or the parents, nor to any aspect of the adoption process.

{¶ 42} By contrast, a number of other states use critical procedural events as the deadline to register as a putative father. In Indiana, the putative-father-registry ("PFR") deadline is the date that the adoption petition is filed or the date that the petition to terminate the mother's parental rights is filed, whichever occurs later. Ind.Code 31-19-5-12(a). That makes sense and passes constitutional muster: once an adoption proceeding is commenced, both the state and the child have the right to know if a parent is going to contest the proceeding. In Florida, the PFR filing deadline is the date that the petition to terminate parental rights is filed. Fla.Stat. 63.054(1) and 63.062(1)(b)(4)-(5). Once again, a nonarbitrary deadline that is rationally tied to the adoption process is utilized.

**{¶ 43}** The majority suggests that the legislative intent in enacting the 30-day registration deadline in former R.C. 3107.07(B)(1) and former R.C. 3107.062 was to streamline the long and complicated process leading to the finalization of an adoption and to prevent unnecessary interruptions to the process caused by putative fathers belatedly attempting to exercise their rights. I reject that suggestion. In selecting an arbitrary 30-day PFR filing deadline, the legislature has failed to consider the rights of biological fathers to participate in the upbringing of their own children.

**{¶ 44}** I find it difficult to believe that most men in the state of Ohio are aware of the PFR, let alone the deadlines that are set forth in the statute. Accordingly, fathers' fundamental parental rights are being terminated without the fathers being provided with a meaningful opportunity to be heard. If the deadline were set to coincide with a meaningful event, for example, a deadline of 30 days after the filing of a petition to terminate parental rights or a petition for the child's adoption, the statute would provide both a nonarbitrary standard and a much greater probability that the father will be notified of the event and be included in the process. Even the majority noted that "the policy behind a 30-day (or 15-day) registration deadline appears to be questionable in the context of an adoption petition that is filed well past the 30-day deadline." Majority opinion ¶ 36. It is more than questionable. It is arbitrary, designed solely for the convenience of an unnecessary bureaucratic process, and unconstitutional.

**{¶ 45}** I must conclude that former R.C. 3107.07(B)(1) and former R.C. 3107.062, both as applied to CSM and on their faces, violate Article I, Section 16 of the Ohio Constitution. Due process has been denied.

**{¶ 46}** Accordingly, I respectfully dissent.

_____

Erik L. Smith, for appellant.

Voorhees & Levy, L.L.C., and Michael R. Voorhees, for appellees.

Susan Garner Eisenman, urging affirmance for amicus curiae, American Academy of Adoption Attorneys.

_____