[Cite as *In re Adoption of F.F.L.*, 2024-Ohio-1901.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: F.F.L. | : | |
| | : | |
| | : | C.A. No. 2023-CA-61 |
| | : | |
| | : | Trial Court Case No. 11414AD |
| | : | |
| | : | (Appeal from Common Pleas Court-Probate Division) |
| | : | |
| | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 16, 2024

. . . . . . . . . . .

SUSAN GARNER EISENMAN and MICHAEL R. VOORHEES, Attorneys for Appellants

CHRISTOPHER D. CLARK, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Petitioners M.G.L. and A.C.L. appeal from a judgment of the Greene County Probate Court dismissing their petition to adopt F.F.L. The court found that Petitioners had failed to sustain their burden to establish by clear and convincing evidence that the consent of the child's putative father, R.D., was not required. Insofar as R.D. refused to

consent, the probate court dismissed the petition for adoption.

{¶ 2} For the reasons stated below, we affirm the judgment of the trial court finding that R.D.'s consent to the adoption was required.

## Facts and Procedural History

{¶ 3} On December 12, 2022, prior to F.F.L.'s birth, R.D. completed an Ohio Putative Father Registry Application, which entitled him to notice of any adoption proceeding involving the child. The application informed putative fathers that completing the form was not enough to protect the right to be a legal father of the child identified on this form and provided contact information for the Office of Child Support Enforcement for "further information on filing a parentage action form."

{¶ 4} F.F.L. was born in January 2023. R.D. and V.M., F.F.L.'s biological mother, were never married, and R.D. was not identified on the birth certificate. V.M. surrendered F.F.L. to the permanent custody of Adoption Link, Inc., an adoption agency, a few days after birth. The surrender form indicated that V.M. was "not prepared to parent this child" and that she chose Petitioners to raise F.F.L. in an open adoption. F.F.L. was placed in Petitioners' home on the same day by Adoption Link.

{¶ 5} Adoption Link requested a search of the Ohio Putative Father Registry and filed a Consent to Adoption form on February 7, 2023. Petitioners also filed a Petition for Adoption of Minor on February 7, 2023. In their petition, Petitioners indicated that R.D.'s consent to the adoption was not required pursuant to R.C. 3107.07, because V.M. had entered into a voluntary permanent surrender agreement with Adoption Link and 1)

R.D. was not the father of F.F.L.; 2) R.D. had willfully abandoned or failed to care for and support F.F.L.; 3) R.D. had willfully abandoned V.M. during her pregnancy and up to the time of her surrender of F.F.L. or her placement with Petitioners; and 4) V.M. had a constitutional right to place F.F.L. for adoption.

{¶ 6} A notice of hearing on the petition for adoption was issued to R.D. on February 7, 2023.   The notice stated:

A FINAL DECREE OF ADOPTION, IF GRANTED, WILL RELIEVE YOU OF ALL PARENTAL RIGHTS AND RESPONSIBILITIES, INCLUDING THE RIGHT TO CONTACT THE MINOR, AND, EXCEPT WITH THE RESPECT TO A SPOUSE OF THE ADOPTION PETITIONER AND RELATIVES OF THAT SPOUSE, TERMINATE ALL LEGAL RELATIONSHIPS BETWEEN THE MINOR AND YOU AND THE MINOR'S OTHER RELATIVES, SO THAT THE MINOR THEREAFTER IS A STRANGER TO YOU AND THE MINOR'S FORMER RELATIVES FOR ALL PURPOSES.  IF YOU WISH TO CONTEST THE ADOPTION, YOU MUST FILE AN OBJECTION TO THE PETITION WITHIN FOURTEEN DAYS AFTER PROOF OF SERVICE OF NOTICE OF THE FILING OF THE PETITION AND OF THE TIME AND PLACE OF HEARING IS GIVEN TO YOU.  IF YOU WISH TO CONTEST THE ADOPTION, YOU MUST ALSO APPEAR AT THE HEARING.  A FINAL DECREE OF ADOPTION MAY BE ENTERED IF YOU FAIL TO FILE AN OBJECTION TO THE ADOPTION PETITION OR APPEAR AT THE HEARING.

**{¶ 7}** On February 13, 2023, R.D. filed an Objection to Adoption. On February 22, 2023, the probate court continued the scheduled hearing on the adoption petition and set the matter for a pretrial conference, at which time it would determine a date for consideration of whether R.D.'s consent for the adoption was required. The consent hearing occurred August 29, 2023. After the hearing, the court ordered the parties to submit post-trial briefs, and they did so. On October 19, 2023, the court found that R.D.'s consent was required; in light of R.D.'s refusal to consent, the court dismissed the adoption petition.

**{¶ 8}** Petitioners appeal and have filed a brief. R.D. did not file a responsive brief. The Ohio Adoption Law Roundtable ("Roundtable"), an association of attorneys focused on adoption law, filed an amicus brief in support of Petitioners.

### Assignments of Error and Analysis

**{¶ 9}** Petitioners assert four assignments of error on appeal, which we will consider together. They are as follows:

> R.D. WILLFULLY ABANDONED V.M. DURING HER PREGNANCY, UP TO THE TIME OF THE AGENCY SURRENDER. PER R.C. §3107.07(B)(2)(c) R.D.'S CONSENT TO F.F.L'S ADOPTION SHOULD NOT BE REQUIRED. THE TRIAL COURT'S FINDING TO THE CONTRARY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND OHIO LAW AND IS A MISCONSTRUCTION OF R.C. § 3107.07(B)(2)(c).

> R.D. HAS WILLFULLY FAILED TO SUPPORT F.F.L. OVER THE

TWELVE MONTHS SINCE HER BIRTH. THEREFORE, HIS CONSENT TO THE ADOPTION IS NOT REQUIRED. THE TRIAL COURT'S FINDING TO THE CONTRARY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND OHIO LAW AND IS AN IMPROPER JUDICIAL MISCONSTRUCTION OF R.C. § 3107.07(B)(2)(b).

THE TRIAL COURT DECISION VIOLATES THE OHIO REVISED CODE'S RULES OF CONSTRUCTION (CHAPTER 1). THE DECISION IS BASED UPON THE JUDGE[']S PERSONAL SENSE OF "FAIRNESS," IGNORES THE STATUTORY CONSTRUCTION RULES AND THE ORDINARY MEANING OF THE WORDS, FAILS TO CONSIDER LEGISLATIVE HISTORY, THE OBJECT SOUGHT, AND THE CONSEQUENCES OF INTERPRETATION. IT RENDERS R.C. § 3107.07(B) INEFFECTIVE AND VIOLATES R.C. §1.49.

THE RECORD AND DECISION BELOW DEMONSTRATE THAT THE TRIAL COURT LOST ITS WAY IN THE ANALYSIS OF THE CASE. THE TRIAL COURT'S DECISION SHOULD BE REVERSED.

{¶ 10} In their first assignment of error, Petitioners argue that R.D. made "a conscious choice" to cease communicating with V.M. for the last five months of her pregnancy. They assert that if R.D. had taken steps to establish paternity, it would have stopped any adoption plan prior to surrender of the child, and that R.D. was on notice that there were ways to establish paternity when he applied for inclusion on the putative father registry. Petitioners assert that R.D.'s actions in choosing to "fight" the adoption and to

establish "a career which he believed would aid him in gaining custody" of the baby focused his attention on fighting with V.M. rather than assisting her. As an example, Petitioners assert that R.D. purchased a Pak'n Play for his own apartment and did not make V.M. aware of the purchase, such that V.M. and F.F.L. did not benefit from the purchase. According to Petitioners, because R.D. did not attempt to locate V.M., he cannot legitimately complain about the difficulty in getting support to her. They assert that R.D.'s belief that V.M. would reject his support was "mere speculation."

{¶ 11} In their second assignment of error, Petitioners argue that they provided financially and emotionally for V.M. during her pregnancy and for F.F.L. throughout her life. They argue that R.D. had a duty to F.F.L. from the time of her birth which "did not abate" because F.F.L. was in the custody of Petitioners. They argue that, where there has been a willful failure to provide support or an abandonment, a parent's consent to an adoption is not required. Petitioners cite *In re Adoption of Hart,* 62 Ohio App.3d 544*,* 577 N.E.2d 77, (6th Dist.1989), for a definition of "willful" and contend that the probate court abused its discretion in "create[ing] its own more expansive definition," which required proof that R.D. failed to support the child "with the intention to *never* again provide support [for] or be associated with" her. Petitioners argue that the court viewed willfulness as a state of mind, but there was no evidence as to R.D.'s state of mind because this was not a "statutory requirement." They argue that examples of a putative father's non-willful failure to provide support would include a documented inability to work, a lack of resources, and a lack of knowledge of pregnancy.

{¶ 12} In their third assignment of error, Petitioners assert that the probate court

added requirements to the common meanings of the words "willful" and "abandon."   In their fourth assignment of error, Petitioners argue that the probate court erroneously admitted text messages sent by M.D. based on the testimony of the purported sender, M.D., without confirming that the messages were received. They argue that there was "no evidence as to R.D.'s intent to raise this child," and the probate court's finding to the contrary demonstrates that the court lost its way.

{¶ 13} The Ohio Adoption Law Roundtable ("Roundtable") argues in its brief that the probate court erroneously added "intention" and "fairness" to the clear and unambiguous language of the statute, which wrongfully elevated R.D.'s rights as a putative father above those of a legal parent, and "went to extremes" to excuse R.D.'s neglect of his duties.   The Roundtable also asserts that the intent of the General Assembly in enacting the Ohio Putative Father Registry in 1996 and in subsequently reducing the registration timeframe was to require significantly more action by a putative father "than mere registration and objection."   The Roundtable asserts that R.D. "exerted virtually no effort or action for 7½ months" and that pursuing litigation was not enough.

**The Consent Hearing**

{¶ 14} V.M., R.D., and M.D. (R.D.'s mother) testified at the consent hearing.

{¶ 15} V.M. testified that she was born in 2005.   She and R.D. went to the same high school and subsequently developed a relationship that led to them "hanging out" together.   V.M. was 16 years old when she learned she was pregnant in May 2022.   R.D. was present when she took the pregnancy test and accompanied V.M. to her first ultrasound appointment.   According to V.M., their relationship "was not the best," and

she told R.D. that she no longer wanted to be in a relationship with him and wanted time to think about what she was going to do about the pregnancy. V.M. wanted the child to have a better life than V.M. could provide for her. V.M. told R.D. she was considering an open adoption, and "he said no." V.M. then told R.D. that she "didn't want contact anymore, at least for a while to think about everything." Contact between R.D. and V.M. ceased at the end of the summer of 2022. According to V.M., R.D. did not attempt to have any contact with her during the fall and up until F.F.L.'s birth.

{¶ 16} While looking into the adoption process, V.M. met Petitioners, liked them, and stayed in close contact with them through her pregnancy. V.M. went into labor about six weeks early, and Petitioners were present at the hospital for F.F.L.'s birth. V.M. felt that R.D. had failed to provide financial or emotional support for her, and she did not believe that he accepted responsibility for her during the pregnancy. V.M. had no contact with R.D. after F.F.L.'s birth.

{¶ 17} On cross-examination, V.M. testified that there was no doubt that R.D. was F.F.L.'s father. She acknowledged that her mother had threatened R.D. with a restraining order if he did not stop contacting V.M. during the pregnancy. V.M. testified that R.D. had not advised her that he had purchased baby supplies for the baby, but his mother bought one outfit. V.M. acknowledged that R.D.'s lack of contact with her could have been based on her own preference and the threat of a protection order. She did not inform R.D. of F.F.L.'s location after the baby was born and stated that she did not have his number. On redirect examination, V.M. stated that she wanted no contact with R.D. because she had not been happy in their "very toxic relationship." She did not

believe that R.D. would have taken any responsibility for her during her pregnancy if she had resumed contact with him.

{¶ 18} R.D. was first called as on cross-examination by Petitioners. He stated that he was born in July 2003 and had lived with his girlfriend in Medway for three or four months at the time of the hearing. Prior to that, R.D. had lived in Xenia with his older brother. R.D. was a union ironworker and had been laid off the previous Friday from a bridge project. Previously, R.D. had worked at Wright Patterson Airforce Base as an iron worker for a month and a half; he stated that, depending on the job, he might work for six months at a time or just a few days.

{¶ 19} According to R.D., after he told V.M. that he did not want the baby to be placed for adoption, she did not advise him of any further plans for the baby. With respect to providing financial support during her pregnancy, R.D. stated that he "was only with her during the pregnancy for maybe a month, month-and-a-half or so - - and it was still kind of fresh." R.D. had been working on starting his career as an ironworker at the time. He acknowledged that he did not provide financial support or commence an action in juvenile court regarding his parentage of the child. R.D. testified that he did attempt to provide support, noting that he bought a new Pak'n Play and newborn-size diapers; he also had toys from family members and a bag of clothes from his cousin at his brother's home. R.D. had been aware of Adoption Link, Inc.'s involvement early in the process.

{¶ 20} R.D. testified that he sent text messages to V.M. and her father about delivering the baby supplies but never received a response, and he had no way of giving the supplies to the child because he didn't know where the child was. According to R.D.,

he contacted Adoption Link, Inc. and was told F.F.L. had been placed with a family, and he did not know where to send the stuff. He also recalled V.M.'s threat to take legal action against him. R.D. did not purchase any more items because he did not know the child's size. R.D. acknowledged that Petitioners had provided all the care and support for F.F.L. since her birth.

{¶ 21} R.D. testified that, from early in the pregnancy, his relationship with V.M. "wasn't really working out," she didn't want contact with him, and he did not know what her plan was for the baby. She told him she was not ready to be a mom, and he encouraged her to "sign [her] rights over." V.M. did not want to do that, and R.D. felt that she was "trying to hold the kid against [him]. So she went and did her own thing with it," which he felt was unfair. R.D. stated that he thought it "should be a 50/50 thing," but V.M. took all the responsibility and then did her own thing without further discussion with him. "It was a closed case with her."

{¶ 22} R.D. testified that, during the early months of the pregnancy, he had checked on V.M., asked about her appointments and how she was feeling, whether the baby was moving, and whether she knew the gender. He did not get answers. After the summer, when they had stopped talking, he testified that V.M. wouldn't let him do anything, wouldn't talk to him, and threatened him with legal action. He then stopped coming around. R.D. stated that V.M. moved and he did not know where she went, and she told him that she had changed her number. When he tried to call her, a message stated that the number he knew to be hers was unavailable.

{¶ 23} R.D. further testified that he believed he should have "superior" rights to

V.M. with respect to the child because he could provide for the child, and she couldn't, which was the reason she had not wanted to keep the child. But he acknowledged that he had not provided for F.F.L. so far.

{¶ 24} On direct examination, R.D. testified that he stayed with V.M. the first two nights after they found out that she was pregnant and "then I supported her." V.M.'s mother had talked to her about getting an abortion, and V.M. did not want to do that. R.D. testified that he "gave her space" but still texted her and tried to call her, and they would talk. R.D. recounted that V.M. "was going through all types of different emotions because it was something scary and she was young." R.D. testified that he had also been "a little scared" but had tried to support her.

{¶ 25} R.D. testified that V.M. did not know what to do, stopped giving him information, was scared, and listened more to her parents, which he understood because she was young. When V.M. suggested adoption, R.D. stated that he did not want to do that and encouraged her to sign her rights over to him if she did not want to be a parent, but V.M. refused. By the end of July, he and V.M. were barely speaking.

{¶ 26} After he accompanied V.M. to her first ultrasound appointment, V.M. never contacted R.D. regarding the baby, advised him of her doctor appointments, or tried to include him in anything; V.M. learned the gender of the baby but wouldn't tell him or share other information. R.D. eventually learned the baby's gender from V.M.'s father.

{¶ 27} R.D. testified that, as the pregnancy went on:

I started buying diapers for her just so I could prepare before [the baby] did come just so I could have less worries so I could have - - be

prepared.   She'd have clothes to lay in when she was born, stuff like that.

I bought her a brand new Pak'n Play so you could take her home. * * *   I bought a baby watch for her, bought a couple clothes, some toys, told [V.M.] all of that.   She didn't really seem like she was interested.   I know my mom bought her * * * an outfit.   [V.M.] threw that away * * * threw the baby clothes away that my mom bought her * * *.

So then at that point, I didn't want to take anything over there because I didn't know if she was going to throw it away * * *.

{¶ 28} At the hearing, R.D. identified a text message exchange between him and V.M. from the beginning of August 2022, in which he asked about V.M. and the baby. V.M. responded, "Stop texting me if you need to know sum [sic] you'll know."   R.D. also identified a text message he received from V.M.'s mother in September 2022.   It stated, "[R.D.] this is [V.M.'s] mother.   Do not text her, message or try to contact her in anyway [sic].   She does not want to [have] any contact with you at this time.   If you cannot respect her wishes we will take the next step legally."

{¶ 29} R.D. identified photos of the Pak'n Play he had purchased, multiple large packages of diapers, and containers of baby wipes.   When asked why he stopped trying to provide for the baby, R.D. indicated that V.M. had blocked contact with her, and he "didn't want to * * * get involved with the legal situation over" his attempts at contact.   R.D. further testified that he stopped messaging V.M. because he did not want to "get put in a situation" where he could not "fight for" F.F.L. like he was at the hearing.

{¶ 30} M.D., R.D.'s mother, denied that R.D. failed to maintain contact with V.M.

during the pregnancy. She testified that she and R.D. had accompanied V.M. to her first ultrasound appointment, and R.D. had advised V.M. that he wanted to be informed when she learned the gender of the child. According to M.D., R.D. repeatedly asked for information about the baby, and V.M. told him each time that she did not have any information. Around August 12, 2022, M.D. text-messaged V.M. about the baby but did not get a response; she then text-messaged V.M.'s father to ask about how the pregnancy was progressing and about the baby. V.M.'s father responded the next day and advised M.D. that the baby was a girl and that V.M. was still in favor of adoption. M.D. advised V.M.'s father that R.D. and V.M. "need[ed] to sit down and talk to each other and respect each other, because it's no longer about them, it's about the baby * * * and what they feel is best for that child." M.D. received no further updates about V.M. or the baby. Petitioners objected to M.D.'s testimony, but the court found that M.D.'s testimony was relevant in that it corroborated R.D.'s testimony about attempts to stay in contact with V.M.

{¶ 31} In November 2022, M.D. sent V.M. a photograph of the baby items that R.D. had purchased for the baby and advised her that R.D. "has been providing and trying to get things in order for the baby." M.D. offered to meet V.M. somewhere to give her the items or to drop them off at her home, telling her, "I just want to assure you that he is trying and he has been trying, but you're not responding to us." M.D. never received a response from V.M. M.D. identified text messages she sent on August 12, 2022, September 4, 2022, and November 3, 2022, seeking information about the baby. The November 3, 2022 message to V.M. stated in part: "Look I just wanted to let you know

that [R.D.] has been buying stuff for the baby all along. Do u want him to drop it off on the porch or meet u to give it to u or what? I have outfits and stuff for her too. Not trying to cause drama or anything I just wanted you to know that [R.D.] does and has always wanted this baby and he has been trying to prepare for her."

### The Probate Court's Findings

{¶ 32} The probate court concluded that R.D.'s consent to Petitioners' adoption of F.F.L. was required. The court described the evidence presented in the case as "surprisingly sparse," noting that much of the questioning was unrelated to the actual elements necessary to prove an exception to the requirement of the putative father's consent under Ohio law. The court found that none of the evidence was "disputed in any material way, so the story of this case is relatively clear."

{¶ 33} The court observed that no evidence was presented to dispute that R.D. was F.F.L.'s biological father. The court found that a series of text messages between V.M. and R.D. demonstrated the tension between them shortly before V.M. cut off all contact and refused to respond to R.D.'s attempts to reach her. Texts from V.M.'s mother to R.D. in late August asked R.D. to leave V.M. alone and threatened legal action if he did not do so. The court found that, thereafter, R.D. ceased his attempts to contact V.M. out of fear of legal reprisal. R.D.'s mother, M.D., then attempted to contact V.M. and her father with limited success; V.M.'s father told M.D. that V.M. was placing the baby for adoption, and M.D. suggested they all get together to discuss the situation but did not receive a response. There was evidence that R.D. bought multiple items for the baby, and he and his mother repeatedly tried to reach V.M. about providing the items but

received no response. The court noted that R.D. and M.D. "were completely cut off and ignored."

{¶ 34} The court acknowledged that R.D. had admitted that he did not provide any financial or emotional support to V.M. during the pregnancy, due to his having been "ostracized" and having no way of doing so. The court noted there was no evidence that V.M. requested any assistance from R.D. that he refused to provide, and it found her testimony that he would have not provided any support "speculative and unpersuasive."

{¶ 35} The court noted R.D.'s testimony that he had registered with the Ohio Putative Father Registry to protect his rights, not knowing if V.M. would go through with the adoption, and that his registration was public information that Petitioners and V.M. could have discovered if they tried. The court also noted that R.D. did not find out his child had been born until he received the notice of the adoption hearing.

{¶ 36} The court found that V.M. had pursued her adoption plan without R.D.'s participation or input, met with Petitioners and chose them as the adoptive parents, and communicated with them frequently during her pregnancy. They were present at the hospital when F.F.L. was born, but R.D. was not even informed that V.M. had had the baby and was not given an opportunity to see his child.

{¶ 37} Upon learning of the adoption, R.D. promptly secured appointed legal counsel and filed a written objection to the adoption. He contacted the adoption agency to ask about the child and was told the child had already been placed for adoption. There was no evidence that the adoption agency provided any other information to R.D., and R.D. then recognized that he would have to fight the matter in court.

{¶ 38} The court acknowledged R.D.'s admissions that he had not provided any care or support for F.F.L. since her birth and that Petitioners had provided all of the care and support for the child since she was placed with them. The court noted R.D.'s assertion that he had not known what else he could do except fight the matter in court, which he had done.

{¶ 39} Regarding how the matter might have been handled differently, the court noted that R.D.'s name was not on F.F.L.'s birth certificate and that he had not filed a parentage action or commenced proceedings in juvenile court to seek custody of F.F.L before Petitioners filed the petition for adoption. R.D. also had not attempted to establish a parent child relationship with F.F.L. by acknowledging paternity or through an administrative action. According to the court, no "evidence was presented to show that R.D. was aware of the availability of these steps and refused to act, or if he was just not aware." The court observed that the "feel of this entire case from a factual standpoint" was well summarized in one exchange during R.D.'s testimony: when asked by Petitioner's counsel why R.D. felt his rights in not wanting F.F.L. placed for adoption should outweigh V.M.'s wishes for the child, R.D. "responded that [V.M.] threw him out of the whole picture even though, '[i]t takes two to make one.' "

{¶ 40} The court found that all three witnesses – V.M., R.D., and M.D. – were credible, polite, and respectful and gave clear and concise responses. It described V.M. as "sincere, even when her answers were not necessarily supportive of the Petitioners' position," and found that her testimony was not particularly helpful in establishing an exception to the requirement of R.D.'s consent to the adoption.

{¶ 41} The court found that M.D.'s testimony strongly corroborated R.D.'s efforts to be part of his child's life from the beginning, and it "confirmed the impediments R.D. encountered along the way," which she also experienced. The court found that M.D.'s involvement had been aimed to support her son and try facilitating shared decision-making between V.M. and R.D. and that it did not "sense" selfish motives of wanting to be a grandmother.

{¶ 42} The court was impressed by R.D. It concluded that his testimony was honest, confident, and consistent, even in the face of some confusing questioning. "The story of his efforts was consistent from the beginning to end, even with respect to answers that did not help his cause." The court found that R.D. sincerely conveyed that he was trying to do the right thing and trying to accept responsibility for the child he helped to create, although he did not take every step he could have to accomplish that. The court found it evident from R.D.'s demeanor that "he was fighting this adoption for himself and his desire to be part of his child's life, rather than at the insistence of his mother, as is often the case in these types of situations. R.D. made a very positive impression on the court.

### The Probate Court's Legal Analysis

{¶ 43} Recognizing that R.C. 3107.06(C) creates a presumption that R.D.'s consent was required, the court noted that "every contested adoption case is different and every case is difficult."

### R.C. 3107.07(B)(2)(a)

{¶ 44} R.C. 3107.07(B)(2)(a) provides that the consent of the putative father is not

required if the putative father is not the father of the minor. The probate court found that Petitioners had the burden to prove that R.C. was <u>not</u> the father, rather than that R.D. had the burden to prove he was the father. The court also found that Petitioners had failed to offer any evidence whatsoever to refute V.M.'s and R.D.'s testimony that R.D. was F.F.L.'s father, and it concluded that the "undisputed evidence" indicated that R.D. was F.F.L.'s biological father. The court noted that its conclusion was not a judicial determination that R.D. was the legal father of F.F.L. but simply a determination that the R.C. 3107.07(B)(2)(a) exception to the requirement of the putative father's consent did not apply in this case.

{¶ 45} The court rejected Petitioner's argument that R.D. should have been more diligent in filing a paternity suit to establish himself as the child's legal father, finding no requirement in R.C. Chapter 3107 that a putative father to file a paternity suit or to otherwise establish paternity administratively within a particular timeframe. Thus, the fact that R.D. had not instituted paternity proceedings prior to the filing of the adoption petition simply meant that he had not been determined to be the legal father; it did not diminish his status as a putative father.

{¶ 46} The court noted that Petitioners filed their petition for adoption 27 days after F.F.L.'s birth, which "could be seen as a calculated effort to narrow the window for R.D. to file a paternity action in juvenile court," because once an adoption proceeding is initiated, the juvenile court is precluded from entertaining a parentage action. The court found that failing to file a paternity action simply meant that R.D. "faced a tougher road" in the adoption proceeding because he was a putative father rather than a legal father. .

{¶ 47} The court concluded that "if, or when, or how soon a putative father seeks to formally establish his parent-child relationship" is not part the consent analysis pursuant to R.C. 3107.07(B)(2)(a) and has nothing to do with determining whether the putative father is in fact the child's biological parent. The court found that Petitioners' argument with respect to the need to establish paternity was "an effort to twist the language of R.C. 3107.07(B)(2) into something it is not" and interpretation of the statute that was "untenable." As such, the court concluded that Petitioners failed to sustain their burden to prove by clear and convincing evidence that R.D. was not F.F.L.'s biological father.

## R.C. 3107.07(B)(2)(b)

{¶ 48} R.C. 3107.07(B)(2)(b) states that a putative father's consent to adoption is not required if he has willfully abandoned or failed to care for and support the minor child. The probate court determined that application of this provision was the central issue in the case and Petitioners' "only remotely plausible argument." It also noted that factual determinations are key to assessing willful abandonment or failure to support. The court found that R.D. had not willfully abandoned or failed to care for and support F.F.L.

{¶ 49} In reaching this conclusion, the probate court distinguished this case from *In re Adoption of V.R.K.,* 2d Dist. Greene No. 2018-CA-34, 2018-Ohio-4881, which affirmed the probate court's decision that the putative father's consent to the adoption was not required under R.C. 3107.07(B)(2)(b). In the court's view, F.F.L.'s case "present[ed] a much more obvious concerted effort to exclude R.D. from every aspect of the process" and to impede R.D.'s efforts to be involved; also, the putative father in *V.R.K.* lacked credibility and was found to be pursuing the child more for the benefit of his mother

than for himself, which was not the case with F.F.L. The court also distinguished *In re Adoption of E.E.R.K.*, 2d Dist. Miami No. 2013-CA-35, 2014-Ohio-1276, wherein the putative father "did not demonstrate a sincere interest in raising the child on his own." The court noted that the efforts of the putative father in *E.E.R.K.* "were sporadic and inconsistent, even though there was no evidence of any impediment to his actions."

{¶ 50} The court found that F.F.L.'s case was more analogous to *In re Adoption of B.A.H.,* 2d Dist. Greene No. 2012-CA-44, 2012-Ohio-4441, with the "critical similarity" being the effect that "obstructionist efforts toward the putative father" had on the determination of whether the putative father's deficiencies in his obligations toward the birthmother and the child were "willful." The court found that *B.A.H.* "stands for the proposition that impediments have consequences. Fairness dictates that you cannot set someone up for failure and then complain that they failed."

{¶ 51} The court rejected the suggestion that the concept of willful behavior is "black and white"; rather, quoting *B.A.H.*, it determined that the word willful "is a broader concept that reflects the putative father's state of mind and purpose in doing or not doing something – 'proceeding from a conscious motion of the will' and '[i]ntending the result which actually comes to pass.' " According to the court, something is not done willfully just because it did, in fact, happen, and the undisputed facts that R.D. did not seek to establish a parent-child relationship with F.F.L., provide financial support, or deliver the baby items he purchased did not "answer the critical question of whether those failures were 'willful.' " In fact, the court concluded that there was hardly any credible evidence that the deficiencies in R.D.'s performance were "willful." The court characterized this as

"the downfall of Petitioners' case," because they had the burden to prove by clear and convincing evidence that R.D.'s failings were willful, and they failed in that regard.

{¶ 52} In rejecting the argument that R.D.'s consent to the adoption was unnecessary because had had willfully abandoned F.F.L., it was significant to the court that R.D. had complied with deadlines for registering with the Putative Father Registry and for filing an objection to the adoption petition. The court noted that there are "no similar deadlines" for establishing a legally recognized parent-child relationship, and it found that R.D.'s failure to take steps to establish his legal parenthood did not constitute abandonment; R.D. "never relinquished or gave up any rights to his daughter with the intention of never reclaiming his rights." Rather, he simply had not yet pursued those parental rights, and had not yet been legally required to do so.

{¶ 53} Petitioners' relied on the definition of abandonment in R.C. 2151.011(C), which is that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days * * *." But the probate court found that the juvenile code did not apply to probate proceedings, noting that the legislature could have relied upon that definition, but did not, and that F.F.L. had been living with Petitioners since before R.D. even knew she was born. The court found Petitioners were "grasping at straws" and failed to "sustain their burden of proof by clear and convincing evidence to show that R.D. 'willfully abandoned' his child."

{¶ 54} Finally, although it was undisputed that R.D. had not provided care and support F.F.L., the court found that Petitioners' arguments ignored the requirement that R.D.'s failure to do so be willful. The court rejected the assertion that "justifiable cause"

in R.C. 3107.07(A) "is somehow a higher standard than 'willful' in R.C. 3107.07(B)(2)(b)," such that the "comparison is pointless." According to the court, acting "willfully" pursuant to R.C. 3107.07(B)(2)(b) "describes the state of mind, the purpose and intent behind not performing a required act" rather than justifiable cause or an excuse for not doing something. The court found that Petitioners merely "proved that [R.D.] did not provide care and support" without addressing the element of "willfully." According to the court, Petitioners failed to produce any credible evidence as to how R.D. could have "cared for" a child already placed for adoption. The court found R.D.'s efforts to get the items he purchased to V.M. before F.F.L.'s birth or to F.F.L. after her birth were obstructed, which was "not an excuse" but did show that his failure to provide care and support "was not purposeful or intentional." The court found that Petitioners offered no clear and convincing proof that R.D.'s failure to provide financial or non-financial support for his child "was a designed plan with the intent to avoid his obligations of support"; as such. R.C. 3107.07(B)(2)(b) was "not a viable exception to the requirement of R.D.'s consent in this case."

## R.C. 3101.07(B)(2)(c)

{¶ 55} R.C. 3101.07(B)(2)(c) states that the putative father's consent to adoption is not required if the putative father "has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first." With respect to this exception, the court found that R.D. had not willfully abandoned F.F.L.'s mother, V.M., during her pregnancy and up to the time of the baby's surrender. The court described Petitioners'

view of the evidence on this issue as "disingenuous and distorted." Based on the court's view of the evidence, there was no doubt that V.M., her parents, or both, "were unilaterally responsible for the complete disconnect that occurred between [V.M.] and R.D. during the pregnancy." The court noted that V.M. admitted this fact during her testimony, and it rejected Petitioners' effort to "twist the facts" so as to characterize the purposeful impediments that V.M. and others created as R.D.'s willful abandonment.

{¶ 56} The court found R.D.'s testimony that he had ceased trying to communicate with V.M. out of fear of legal consequence to be "entirely credible." The court noted it was "not aware of any requirement in the law that a putative father must continue to push until legal action, in the form of a restraining order or otherwise, is actually undertaken in order to clear himself of having 'willfully abandoned' the mother of his child." The court found that proposition to be absurd and unsupported by any law cited by Petitioners.

{¶ 57} The court determined that, after the threat of legal action, R.D. continued his efforts to reach out to V.M. through his mother, but her efforts were also unsuccessful. It was significant to the court that V.M. and her parents did not even let R.D. know when the child was born. According to the court, Petitioners failed to sustain their burden to prove by clear and convincing evidence that R.C. had willfully abandoned V.M. during her pregnancy and up to the point she surrendered the baby.

## Law and Analysis

{¶ 58} R.C. Chapter 3107 governs adoption. "A parent has a fundamental right to care for and have custody of his or her child." *In re Adoption of K.C.*, 2d Dist.

Montgomery No. 22243, 2008-Ohio-2593, ¶ 10.   An adoption terminates those rights, and the mother of the child, the father of the child, or a putative father are presumed to have the right to withhold consent to an adoption under R.C. 3107.06(A) through (C).   *In re Adoption of H.P.,* 171 Ohio St.3d 453, 2022-Ohio-4369, 218 N.E.3d 828, ¶ 20.   A party may overcome this presumption by establishing that an exception to the consent requirement under R.C. 3107.07 applies.   *Id.*

{¶ 59} "A putative father is simply a man who might be a child's biological father but who has no legal relationship with the child through marriage to the mother or the establishment of legal paternity.   *In re Adoption of H.N.R.,* 145 Ohio St.3d 144, 2015-Ohio-5476, 47 N.E.3d 803, ¶ 16, citing R.C. 3107.01(H).

Under Ohio law, a "putative father" is a man * * * who may be a child's father and to whom all of the following apply: 1) he was not married to the child's mother at the time of the child's conception or birth; 2) he has not adopted the child; 3) he has not been determined to have a parent and child relationship with the child by a court or administrative proceeding that occurred prior to the date a petition to adopt the child is filed; and 4) he has not acknowledged paternity of the child pursuant to R.C. 3111.21-R.C. 3111.35.

*In re Adoption of Z.G.A.,* 2d Dist. Greene No. 2015-CA-51, 2016-Ohio-238, ¶ 13.

{¶ 60} "In 1996, Ohio established a Putative Father Registry; if a man registers as the putative father of a child, he will receive notice, at the address or telephone number he provides, of any petition that may be filed to adopt a minor he claims as his child."   *Id.,*

citing R.C. 3107.062. "Since establishing a putative-father registry in 1996, Ohio has clearly warned putative fathers that '[a] man who has sexual intercourse with a woman is on notice that if a child is born as a result and the man is the putative father, the child may be adopted without his consent pursuant to" R.C. 3107.07(B). *H.P.* at ¶ 1, citing R.C. 3107.061. "[U]nder Ohio's statutory scheme, putative fathers need not have notice of a birth or even of a pregnancy to have their rights foreclosed." *Z.G.A.* at ¶ 20. Further, R.C. 3103.03(A) "contains the statutory declaration that all * * * parents have an obligation to support * * * their minor child from their own property and labor * * *." *In re Adoption of B.I.*,157 Ohio St.3d 29, 2019-Ohio-2450, 131 N.E.3d 28, ¶ 19. "The statute subsumes the common-law obligation: 'The common-law duty to support one's minor child has been replaced by R.C. 3103.03.' " *Id.* at ¶ 20, quoting *Nokes v. Nokes,* 47 Ohio St.2d 1, 5, 351 N.E.2d 174 (1976).

{¶ 61} R.C. 3107.07 provides in relevant part:

Consent to adoption is not required of any of the following:

(A) A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

(B) The putative father of a minor if either of the following applies:

(1) The putative father fails to register as the minor's putative father with the putative father registry established under [R.C. 3107.062] not later than 15 days after the minor's birth.

(2)  The court finds, after proper service of notice and hearing, that any of the following are the case:

(a) The putative father is not the father of the minor;

(b) The putative father has willfully abandoned or failed to care for and support the minor;

(c)  The putative father has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first.

{¶ 62} The criteria set forth in R.C. 3107.07(A) have no applicability to putative fathers.  *In re Adoption of R.C.A.*, 2d Dist. Montgomery No. 19509, 2003-Ohio-607, ¶ 9. In order for a putative father who has timely registered in the Putative Father Registry "to attain the status of one whose consent is required for an adoption," three things must occur.  *H.N.R.,* 145 Ohio St.3d 144, 2015-Ohio-5476, 47 N.E.3d 803, at ¶ 18.  The putative father must file an objection within 14 days after he has been given notice of the filing of an adoption petition, pursuant to R.C. 3107.07(K); he must participate in a hearing on the adoption petition as provided in R.C. 3107.11, and at that hearing, under R.C. 3107.0[7](B)(2), "the court must find that he is the father of the child and that he did not willfully abandon the child or the mother during the pregnancy or during any period prior

to the surrender and/or placement of the child for adoption." *Id.*

{¶ 63} The "nature of these conditions is such that each one must be satisfied chronologically in order for the next condition to arise. The failure to satisfy any one of the conditions brings the putative-father process to an end." *Id.* at ¶ 19. Apart from this process, however, "a father still has the option of securing the right to withhold consent to an adoption by establishing legal paternity through court or administrative proceedings, which do not have the same 30-day time limitation." *Id.,* citing R.C. 3111.01 et seq.; R.C. 3111.38 et seq.

{¶ 64} As noted above, R.C. 3107.07(A) and (B) distinguish between a "parent of a minor" and a "putative father." The " 'opportunity' interest that a putative father has in developing a parent-child relationship" is "far different from the fundamental liberty interest in raising one's children, which is afforded strong constitutional protections only upon the establishment of a parent-child relationship." *H.N.R.* at ¶ 26, citing *Lehr v. Robertson,* 463 U.S. 248, 256-262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), and discussing other cases. "Courts have commented that the rights of a putative father must be balanced with the protection of the best interests of children, including the provision of a permanent and stable home and the completion of the adoption process in an expeditious manner." (Citations omitted.) *Z.G.A.,* 2d Dist. Greene No. 2015-CA-51, 2016-Ohio-238, at ¶ 21.

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may

be said that he "act[s] as a father toward his children." But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds.

(Citations omitted.) *H.N.R.,* at ¶ 26*,* quoting *Lehr* at 261.

**{¶ 65}** "Any exception to the requirement of parental consent [to adoption] must be strictly construed so as to protect the right of [bioloigical] parents to raise and nurture their children." *In re Schoeppner*, 46 Ohio St.2d 21, 24, 345 N.E.2d 608 (1976). Accordingly, in order to show that R.D.'s consent was not required, Petitioners had to demonstrate by clear and convincing evidence the existence of an exception to the consent requirement. *B.A.H.,* 2d Dist. Greene No. 2012-CA-44, 2012-Ohio-4441, at ¶ 20, citing *In re Adoption of Hart*, 62 Ohio App.3d 544, 552, 557 N.E.2d 77 (6th Dist. 1989). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶ 66}** Whether Petitioners met this burden is a determination for the probate court that will not be disturbed on appeal unless the decision is against the manifest weight of the evidence. *B.A.H.* at ¶ 21.

* * * Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being

against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 281, 376 N.E.2d 578 (1978). The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 12, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice' that there must be a reversal of the judgment and an order for a new trial." *Steagall v. Crossman*, 2d Dist. Montgomery No. 20306, 2004-Ohio-4691, ¶ 29.

*Id.*

**{¶ 67}** R.D. took sufficient steps to preserve the requirement of his consent to the adoption by registering as F.F.L.'s putative father. Regarding R.C. 3107.07(B)(2)(a), we agree with the probate court that Petitioners failed to meet their burden of proving, by clear and convincing evidence, that R.D. was not the father of F.F.L. V.M. had no doubt that R.D. was the father, and Petitioners adduced no evidence to the contrary. And for purposes of determining whether R.D.'s consent to the adoption was necessary, the court was not required to make a legal determination regarding R.D.'s parentage.

**{¶ 68}** We also agree with the probate court that the central issue in this case was whether R.D. willfully abandoned or failed to care for and support F.F.L. Although the

probate court observed that "fairness" dictates that one cannot be set up for failure and then penalized for failing, we agree with Petitioners that "fairness" is not part of the statutory analysis. In other words, whether "fairness" requires a finding of no willful conduct was not part of the analysis. Nevertheless, for the reasons that follow, we conclude that Petitioners failed to establish, by clear and convincing evidence, that R.D. had willfully abandoned or failed to care for and support F.F.L.

{¶ 69} In *B.A.H.,* we noted that R.C. 3107.07 does not define the term "willfully." "Willful" is defined in *Black's Law Dictionary* as "proceeding from a conscious motion of the will; voluntary. Intending the result which actually comes to pass; designed; intentional; not accidental or involuntary." *B.A.H.*, 2d Dist. Greene No. 2012-CA-44, 2012-Ohio-4441, ¶ *22,* citing *Blacks Law Dictionary* 824 (5th Ed.1983). The Ohio Supreme Court has observed that to abandon "means '1. To leave (someone), esp. when doing so amounts to an abdication of responsibility. 2. To relinquish or give up with the intention of never again reclaiming one's rights or interests in. 3. To desert or go away from permanently.' " *In re Adoption of P.L.H.*, 151 Ohio St.3d 554, 2017-Ohio-5824, 91 N.E.3d 698, ¶ 30, quoting *Black's Law Dictionary* 1 (10th Ed. 2014).

{¶ 70} In *B.A.H.*, which the probate court found to be "closely aligned" to the matter herein, the 18-year-old putative father timely filed a Putative Father Registry Application; the birth mother was 15 years old. For a period of two months after learning of the pregnancy, the putative father attempted to have the birth mother move into his parents' home, provided meals to her several times a week, attended a childbirth class, and attempted to attend a doctor's visit. Then the mother's parents moved her to a maternity

home over two hours away. *B.A.H.* at ¶ 23. The putative father further obtained maternity clothes and baby items for the mother, and he gained employment after the child's birth. *Id.*

{¶ 71} While the mother was at the maternity home, the putative father met with staff and visited with her once; other attempts at contact with her were either rebuffed or cancelled by staff or the mother's parents. *Id.* at ¶ 25. Communication was not only discouraged, but the putative father's ability to communicate with the mother suffered "significant interference" when the maternity home took the mother's cell phone away. *Id.* The putative father also never agreed to an adoption. *Id.* at ¶ 24. Upon learning of the birth, the putative father initiated two visits with the baby before the surrender. *Id.* at ¶ 24. We concluded that the "only reasonable conclusion to be drawn from the evidence * * * [was] that [the putative father] neither willfully, nor otherwise, abandoned [the birth mother] or the baby." *Id.* at ¶ 25.

{¶ 72} Regarding whether the putative father failed to care for or support the child, we found that his acts of inviting the birth mother to reside in his parents' home during the pregnancy and gathering maternity and baby items were " significant efforts by an unemployed eighteen-year-old high-school student to support the baby, especially in view of the fact that he was told by [the maternity home] staff that no additional assistance was required." *Id.* at ¶ 26. We also took into consideration the fact that no one had discussed actual financial costs with the putative father or presented him with any bills. *Id.* at ¶ 27. We concluded that the putative father had not failed in his duty to care for or support the child, and that the probate court had erred in determining that his consent

was not required.   *Id.* at ¶ 28.

{¶ 73} *E.E.R.K.*, 2d Dist. Miami No. 2013-CA-35, 2014-Ohio-1276, is a case that the probate court found to be distinguishable from this case.   In *E.E.R.K.*, we found that the birth mother and the petitioners for adoption had proven, by clear and convincing evidence, that the putative father had willfully abandoned the birth mother and the minor child and had failed to provide support for the baby.   *Id.* at ¶ 26.   There was no dispute that the putative father "never provided any financial, material, or emotional support" during the pregnancy and never inquired if the birth mother needed anything.   *Id.* at ¶ 20. He sent sporadic messages about the status of the pregnancy, and the birth mother timely responded to most of them.   *Id.*   In contrast, the putative father would "wait days" before responding to the birth mother's messages, if he responded at all.   *Id.* at ¶ 21.   The birth mother asked the putative father to speak to her in person about the baby, and he did not respond.   *Id.*   The putative father did not attempt to communicate with the birth mother for three months before the baby was born.   *Id.* at ¶ 22.

{¶ 74} The birth mother in *E.E.R.K.* went to the putative father's house to speak with him very early in the pregnancy, but he was not home.   She spoke to his mother instead, who offered to let the mother live at their house.   *Id.* at ¶ 23.   The putative father's mother testified that she and her husband had offered to adopt the baby, and the birth mother declined.   *Id.*   The putative father testified that he had been unaware that his mother intended to offer to adopt he baby, and he had never "pushed the idea" of the birth mother moving in to his parents' house; he never spoke to the birth mother about either offer.   *Id.*   Although the putative father initially stated that he was willing to join the

military to support the birth mother and the child, "he never pursued the idea"; at the time of the consent hearing, he was living with his parents and working at Menard's. *Id.*

{¶ 75} We affirmed the trial court's decision that the putative father's consent was not required for the adoption of the child. We stated:

Unlike the putative father in *B.A.H.* who made every effort to be involved with and support the mother and child, [the putative father's] sporadic, then non-existent, communication with [the birth mother], coupled with a complete lack of financial and emotional support establish[ed] that he willfully abandoned [the mother] and the baby, and failed to care for or support the minor child. [The putative father] was not involved with his mother's offer of home and shelter to [the birth mother]. [The putative father] himself never even suggested a willingness to raise the child on his own. Additionally, there was no third party involved who attempted to discourage or thwart [the putative father's] involvement with [the birth mother] or the baby.

*Id.* at ¶ 24.

{¶ 76} In *V.R.K.*, 2d Dist. Greene No. 2018-CA-34, 2018-Ohio-4881, the probate court concluded that the putative father's consent to a child's adoption was not required under R.C. 3107(B)(2)(b). In *V.R.K.*, the birth mother and the putative father began dating in the spring of 2017, broke off their relationship months later, and then the birth mother learned she was pregnant in July. *Id.* at ¶ 3. The birth mother moved into the home the putative father shared with his mother after the putative father promised to stop

drinking and obtain employment. *Id.* However, the birth mother subsequently moved to her grandmother's home and blocked the putative father on her cell phone and Facebook, contending that putative father had failed to find work and had encountered legal issues relating to alcohol. *Id.* With respect to the child, the court stated:

> There is no evidence that Putative Father ever actually provided any support for V.R.K. after she was born. He did not set up support payments through the Child Support Enforcement Agency. He did not pay any portion of Mother's medical expenses during her pregnancy after they split up and did not pay anything toward V.R.K.'s care and support after her birth. There is also no evidence that Putative Father ever actually provided any non-monetary support to the child, in the form of clothes, diapers, formula or other baby essentials. Even if Putative Father's testimony that he offered to assist is true, the fact is he did not follow through and actually provide anything. Putative Father admitted that at trial.
>
> * * *
>
> Putative Father's credibility was questionable to this Court. Although he was polite and respectful during his testimony, his demeanor and hesitancy in answering questions clouded the believability of his responses in many instances. He certainly did not corroborate his claims of offering support for the child with any evidence that he actually did so. Putative Father simply did not convey to the Court a sense of complete sincerity in his desire to be a true father to the child. Instead, he left the

Court with a distinct impression that his objection to the adoption was for his mother's benefit more so than his own.

The abundance of Exhibits Putative Father offered into evidence were not persuasive. While the Exhibits demonstrate Putative Father's efforts to communicate with others by means of text messaging and Facebook Messenger, they do not establish any genuine showing of actual support for the Mother or the child.

*V.R.K.* at ¶ 3.

**{¶ 77}** The court noted that the putative father's status made his consent to the adoption necessary unless a statutory exception applied. *Id.* at ¶ 4. The court found that the putative father had registered on the putative father registry, that he was V.R.K.'s biological father, and that he did not willfully abandon the minor or the biological mother, given that the biological mother ended the relationship with him and left his residence before giving birth and placing the child for adoption. *Id.* at ¶ 4-6. The court's resolution of the case hinged on whether the putative father had failed to care for and support the child. In *V.R.K.*, the probate court found that the "complete lack of Putative Father's care for and support of V.R.K., as required in R.C. 3107.07(B)(2)(b), [was] easy to resolve in this case." *Id.* at ¶ 7. The court was "not impressed" with the putative father's effort to show his desire to be a "real dad" to V.R.K. after her birth; in the several weeks between the child's birth and the filing of the petition for adoption, he had not taken any legal action to formally establish his parentage, attempted to gain custody in juvenile court, or done anything else. According to the probate court, the "clear message in R.C.

3107.07(B)(2)(b) is that a putative father cannot sit back, do nothing while others care for and support his child, and then claim he deserves to get the child." *Id.*

{¶ 78} V.R.K.'s putative father argued on appeal that the probate court had erred in failing to consider whether he "willfully" failed to care for and support V.R.K. (The court had observed that the "justifiable cause" standard in R.C. 3107.07(A) did not apply to a putative father.) *Id.* at ¶ 1, 8, 9. In our opinion, we stated: " 'Although it is perhaps unclear whether the word "willfully" modifies only "abandoned" or also modifies "failed to care for and support," this Court previously has read [R.C.] 3107.07(B) as requiring a petitioner to establish a willful failure to care for and support a child.' " *Id.,* quoting *In re Adoption of R.C.A.,* 2d Dist. Montgomery No. 19509, 2003-Ohio-607, ¶ 10, fn. 3, citing *In re Bachman*, 2d Dist. Montgomery No. 15720, 1996 WL 53520 (Sept. 13, 1996). We commented that the trial court's ruling was "perhaps ambiguous as to whether it required proof of a 'willful' failure by [the putative father] to care for and support his child." *Id.* at ¶ 9. It was significant to us that the probate court recognized the putative father's admission that he had never provided any care and support for the child," noting that if "this bare failure to provide care and support" were sufficient to satisfy R.C. 3107.07(B)(2)(b), the trial court could have stopped its analysis there, but it did not. *Id.* at ¶ 10. The probate court identified the ways in which the putative father could have provided support for V.R.K., despite the child having been placed for adoption, such as contacting the adoption agency, establishing his parentage, or seeking custody. *Id.* In our view, the probate court's further analysis would have been unnecessary and irrelevant if the trial court had believed the mere act of failure to provide support alone satisfied the

statute, and it supported a determination that the putative father's failure to provide support was "willful." *Id.*

**{¶ 79}** We addressed the burden of proof in a footnote in *V.R.K.* *Id.* at ¶ 10, fn. 2. We stated that a petitioner need only produce evidence of failure to support, and then "the burden of going forward (not burden of proof) with some evidence of the nonwillfulness" is on the objecting party. Once the objecting party introduces evidence that the failure was non-willful, the burden shifts back to the petitioner to prove willful failure by clear and convincing evidence. *Id.* In *V.R.K.*, the putative father admitted his failure to support and presented no evidence that this failure was non-willful.

**{¶ 80}** In *In re Adoption of Darnall*, 3d Dist. Hancock No. 5-91-27, 1992 WL 19352 (Feb. 6, 1992), the court addressed the level of support required of a putative father. In that case, the child had received payments as a result of his father's qualifying for Social Security disability and $240 in other payments from his birth in 1986 until May 1990. For seven months after his birth, the child's parents had lived together and shared expenses. The father sent used clothing to the child periodically and included him on his medical insurance policy. *Id.* at *3.

**{¶ 81}** *Darnall* held that "the issue before the probate court was only whether the support provided to [the child] by his father constituted 'support' under R.C. 3107.07(B)"; the sufficiency of the support provided was not at issue. The Third District noted that the responsibilities of a parent and a putative father in R.C. 3107.07(A) and (B) are distinct. *Darnall* at *2. The court held that, "since the statute sets no time periods, and contains no modifying adjectives to describe the nature of the expected 'care' or 'support,' we

construe the Ohio statute to allow adoption without the putative father's consent only if there has been a complete failure to develop a relationship with his child, or a failure to contribute to the support of the child," noting that it was required to construe the legislative language "strictly against any claim that parental rights have been abandoned or forfeited." *Id.* at *2-3.

{¶ 82} *Darnall* further observed that "without the legal recognition, defined in R.C. 3107.07(A), or a court order, a putative father has no guidance in fulfilling his parental duties, since he is not required 'by law or judicial decree' to support the child * * *." Thus, it concluded that the law requires less of a putative father to retain his parental rights. *Id.*

{¶ 83} Finally, in *In re Adoption of Wilcox*, 2d Dist. Montgomery No. 7907, 1983 WL 4865 (Mar. 23, 1983), it was undisputed that the putative father had not supported the child or its mother during the pregnancy; the narrow issue was whether the putative father's failure to support the child or the mother was done willfully.[1] *Id.* at *2. We held that the word "willfully" has a generally accepted meaning and required more than a failure; willfully "means that the failure must be at least voluntary and intentional when the actor has the ability to provide support." *Id.* We held that all the circumstances must be considered, including the expressed statements of the mother of the child with respect to support of the child. *Id.*

{¶ 84} In *Wilcox,* the child was born in December 1979, and an application was

---

[1] The version of R.C. 3107.07(B) in effect at the time "provide[d] for waiver of consent to adoption where the putative father of a minor – 'has willfully abandoned or failed to care for and support the minor, or abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or its placement in the home of the petitioner, whichever comes first.' "

filed to place custody with the maternal grandparents in August 1981. The putative father's address was listed as unknown, and the placement was ordered without notice to him. Thereafter, mail service was issued to the putative father, and he promptly filed an objection. *Id.*

{¶ 85} The mother had not completed high school when the child was born. Mother became pregnant shortly after the couple began dating; they continued their relationship for several months, and then the putative father left town. The mother lived with her parents until she gained employment and moved out on her own. She received welfare when she was unemployed. The hospital expenses were not paid. *Id.*

{¶ 86} After learning of the pregnancy, the mother and putative father discussed abortion, living together, and the possibility of marriage. The mother refused abortion and marriage. The mother testified that the putative father offered assistance to her more than once, but she told him she didn't want any because she didn't know what she wanted to do. *Id.* at * 3. The mother told the putative father three times that she did not want any assistance, and he provided none. *Id.* Mother's parents were upset over her pregnancy and displeased with the putative father, so they did not want him around their house, where the mother was then living. *Id.* After the putative father left Dayton and returned to his parent's home in Portsmouth, the mother and putative father had conversations about getting the child out of mother's parents' home so he could see the child. The mother testified that the putative father had offered to pay the hospital expenses but that she never gave him an answer. *Id.*

{¶ 87} A neighbor of the maternal grandparents testified on behalf of the putative

father, having known him through school and church. She testified that he had offered to pay the medical bills, but he and the mother could not reach an agreement, in part because they did not know each other well when the mother became pregnant. The neighbor testified that the petitioner grandparents did not want any help from the putative father and had told him to stay away. *Id.*

**{¶ 88}** The putative father acknowledged his paternity and said he had not provided support because his help was not wanted or accepted. *Id.*

**{¶ 89}** The *Wilcox* opinion described the parents as "young persons, practically strangers, facing the emotional trauma of an unexpected birth of a child." *Id.* at *4. It stated that their conduct "at best may be described as immature." *Id.* The only testimony related to the willfulness of putative father's non-support was that offers of assistance were repeatedly avoided and refused by the child's mother. Assistance was not tendered, and the child's mother considered this "natural" because she had told the putative father not to send money. The opinion noted that the putative father had lost his job in Dayton in a layoff, had returned to his parents' farm in Portsmouth where he worked for room and board, and had been employed as a truck driver for an unknown period of time; we described his income as "speculative," noting that the record failed to establish that the putative father had the ability "to provide support for anyone." *Id.* Given the putative father's limited financial means and mother's and petitioners' refusal of his offers of support, we concluded that the evidence was insufficient to establish that father's failure to support the mother and child were willful. As such, we reversed the trial court's finding that putative father's consent to the adoption was not required. *Id.*

{¶ 90} Based upon the statutory language and the cases we have discussed, we agree with the probate court's conclusion that Petitioners did not establish, by clear and convincing evidence, that R.D. had willfully abandoned or failed to care for and support F.F.L.. Petitioners failed to prove that R.D. voluntarily or intentionally abdicated his responsibility for F.F.L. with the intention of never reclaiming his parental rights. R.D. never agreed to the adoption, and his ability to communicate with V.M. about F.F.L. suffered significant interference. He made efforts to care for and support his child. R.D. was a union ironworker, and he testified that he was willing and able to provide for F.F.L. He had purchased baby supplies for her before being threatened with legal action if he continued to contact V.M., and he continued to pursue his rights in court. Unlike in some of the other cases we discussed, the court found R.D. to be credible and sincere and found that his text messages demonstrated a genuine showing of actual support for F.F.L. Construing the language of R.C. 3107.07(B)(2)(b) strictly against any assertion that R.D.'s parental rights had been forfeited, Petitioners failed to establish a willful and intentional failure to contribute to F.F.L.'s care and support.

{¶ 91} Finally, we address Petitioners' argument that R.D. willfully abandoned V.M. during her pregnancy, pursuant to R.C. 3107(B)(2)(c). "[A] probate court's finding of willful abandonment under R.C. 3107.07(B)(2)(c) should focus on whether the putative father voluntarily or intentionally deserted, forsook or abdicated all responsibility for the birth mother during her pregnancy and until the mother's surrender of the child or placement of the child in the prospective adoptive home, whichever occurs first." *P.L.H.,* 151 Ohio St.3d 554, 2017-Ohio-5824, 91 N.E.3d 698, at ¶ 31. The probate court

commented that V.M. did not request assistance from R.D., but no statutory or other obligation requires a birth mother to request assistance in order to trigger an evaluation of a putative father's willful abandonment of mother during her pregnancy. Additionally, the probate court placed some emphasis on V.M.'s making an adoption plan without R.D.'s consent or participation, yet V.M. had no duty to include R.D. in her plans. Instead, the focus must be on R.D.'s conduct. Nonetheless, V.M. testified that she did not want any contact from R.D., and her mother threatened him with legal action if he persisted. We agree with the probate court that Petitioners failed to establish by clear and convincing evidence that R.D. had abandoned V.M.

{¶ 92} For the reasons stated above, Petitioners' assignments errors are overruled. We affirm the trial court's dismissal of the petition for adoption of F.F.L. on the basis that R.D.'s consent to the adoption was required.

. . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.