[Cite as *In re Adoption of J.T.S.*, 2026-Ohio-951.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF J.T.S. | : | |
| | : | C.A. No. 2025-CA-62 |
| | : | |
| | : | Trial Court Case No. 20245043 |
| | : | |
| | : | (Appeal from Common Pleas Court-Probate Division) |
| | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on March 20, 2026, the judgment of the trial court is reversed, and the matter remanded for further proceedings consistent with the opinion.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

MARY K. HUFFMAN, JUDGE

EPLEY, J., and HANSEMAN, J., concur.

JARED B. CHAMBERLAIN, Attorney for Appellant
ALFRED WILLIAM SCHNEBLE III, Attorney for Appellee

HUFFMAN, J.

{¶ 1} Appellant-petitioner K.S. appeals from the probate court's judgment granting appellee-intervenor P.H.'s motion to intervene in the adoption of minor J.T.S. and finding that P.H. was entitled to notice of the adoption petition and to withhold his consent to the adoption pending further consideration of all circumstances. The probate court came to these conclusions notwithstanding the fact that the juvenile court did not render its determination of P.H.'s parentage of J.T.S. until more than four months after the adoption petition was filed.

{¶ 2} According to K.S., the probate court erred in determining that P.H. was entitled both to notice of the adoption petition and to withhold consent because P.H. failed to timely register as a putative father within 15 days of J.T.S.'s birth, as required by R.C. 3107.07(B)(1), and because there was no final judicial determination of parentage prior to the date the adoption petition was filed, as required under R.C. 3107.06(A)(3).

{¶ 3} For the reasons that follow, we agree that P.H. was not entitled to notice of the adoption petition under R.C. 3107.11, nor was his consent required under R.C. 3107.06(B) or 3107.06(A)(3). First, P.H. had not timely registered with the Ohio Putative Father Registry ("OPFR") as required under R.C. 3107.07(B)(1). Second, although P.H. had filed a parentage action in the juvenile court nine days before the adoption petition was filed, prior to the date the petition was filed, it was not determined that a parent and child relationship

2

existed. We therefore reverse the judgment of the probate court and remand this matter to proceed to a final hearing on the adoption.

## I. Background Facts and Procedural History

{¶ 4} In early 2018, P.H. and E.S. ("Mother") were living together in a romantic relationship but were unmarried. According to mother, she had moved in with P.H. out of necessity, as she had nowhere else to live. Mother became pregnant, and P.H. was aware of the pregnancy, accompanying mother to several pregnancy-related medical appointments. Later during the pregnancy, Mother's parents persuaded her to move back home, and P.H. and Mother parted ways. Mother had no contact with P.H. beyond that point in time.

{¶ 5} Mother had known petitioner K.S. since the two were children, and they had stayed in contact. After Mother moved back to her parents' house, she and K.S. started dating in the winter of 2018-2019. Mother gave birth to J.T.S. on February 6, 2019. In July 2020, she and K.S. married, and J.T.S. lived with Mother and K.S. Three other children were eventually born of the marriage.

{¶ 6} After P.H. ended his relationship with Mother, he heard rumors that J.T.S. had been aborted. Around the summer of 2023, J.T.S.'s maternal grandmother notified P.H. that J.T.S. had been born in 2019. P.H. claimed that upon learning of J.T.S.'s existence, he sought to have DNA testing to establish paternity in Montgomery County, which was his county of residence at the time. At some point, P.H. learned that he had tried to establish paternity in the wrong county, as J.T.S. was residing in Clark County, not Montgomery County. Between his first attempt in 2023 to mid-year 2024, P.H. did not take any other action to establish paternity of J.T.S.

{¶ 7} Around late summer 2024, when J.T.S. was five-and-a-half years old, P.H. contacted the Clark County Child Support Enforcement Agency ("CSEA"), and Mother received notice from CSEA in late August 2024. On October 29, 2024, P.H. filed a complaint for parentage in the juvenile court and a motion for allocation of parental rights and responsibilities for J.T.S. In his complaint, P.H. requested that the juvenile court order genetic testing to establish paternity.

{¶ 8} Nine days later, on November 7, 2024, K.S., as J.T.S.'s stepfather, filed a petition for adoption of J.T.S. in the probate court. In his petition, K.S. indicated that P.H.'s consent to adoption was unnecessary because P.H. had not timely registered as J.T.S.'s putative father and because P.H. had failed without justifiable cause to provide more than de minimis contact with J.T.S. or to provide for the maintenance and support of J.T.S. for a period of at least one-year immediately preceding the filing of the adoption petition.

{¶ 9} On December 2, 2024, Mother filed a motion to stay P.H.'s juvenile case while the adoption proceeding was pending in the probate court. On January 13, 2025, the juvenile court submitted an entry stating that it had jurisdiction to proceed with respect to the determination of parentage related to the adoption of J.T.S. and ordered the parties to submit to genetic testing. On March 17, 2025, CSEA filed a notice with the juvenile court, which included a DNA parentage test report confirming P.H. to be J.T.S.'s natural father. On March 19, 2025, following the genetic testing, the juvenile court issued an entry providing that, based on the paternity testing results, P.H. was the father of J.T.S.

{¶ 10} On April 28, 2025, P.H. filed a motion in the probate court to intervene and object to the adoption petition and requested the probate court's acceptance of the finding of P.H. as J.T.S.'s natural father. On June 2, 2025, K.S. opposed P.H.'s motion to intervene, setting forth two arguments: (1) a motion to intervene was not the correct procedural

4

mechanism by which P.H. could assert any rights to notice and hearing regarding the adoption; and (2) P.H.'s consent to the adoption was unnecessary, particularly for putative fathers under R.C. 3107.07(B). K.S. argued that because P.H. had failed to register as a putative father in the OPFR within 15 days of J.T.S.'s birth, his consent was unnecessary under R.C. 3107.07(B)(1), and he was not entitled to notice or hearing regarding the adoption.

{¶ 11} The probate court rendered its decision concerning P.H.'s motion to intervene on July 22, 2025, identifying two issues: (1) whether P.H. was entitled to notice of the adoption petition and (2) whether P.H.'s consent was necessary to the probate court's consideration of the adoption petition given that he had failed to register as a putative father in the OPFR. After acknowledging that P.H. had failed to timely register with the OPFR, the court decided that, because he "took steps" to enforce his rights as J.T.S.'s natural father by seeking an administrative decision regarding paternity and, to that end, filed a parentage action in the juvenile court, which determined that he had a legal relationship with J.T.S., P.H. was entitled to notice of the adoption petition and to withhold his consent pending further consideration of all circumstances. The probate court rendered its decision even though the judgment entry establishing parentage was not issued in the juvenile court until more than four months *after* the adoption petition was filed.

{¶ 12} K.S. appealed the probate court's decision granting P.H.'s motion to intervene.

## II. Assignment of Error

*Adoption in Ohio*

{¶ 13} In Ohio, adoption is governed by R.C. Chapter 3107, while paternity actions are primarily regulated by the Ohio Parentage Act in R.C. Chapter 3111. Original and exclusive jurisdiction over adoption proceedings is vested in the probate court, but an action

5

to determine the existence of a father-child relationship (paternity action) may be brought in the juvenile court or other court with jurisdiction under R.C. 2101.022 or 2301.03. *State ex rel. Portage Cty. Welfare Dept. v. Summers*, 38 Ohio St.2d 144, (1974), paragraph two of the syllabus; R.C. 3111.06.

{¶ 14} Under Ohio law, "a petition to adopt a minor may be granted only if written consent to the adoption has been executed" by the persons whose consent is required under the adoption statutes. *In re Adoption of H.P.*, 2022-Ohio-4369, ¶ 20, citing R.C. 3107.06; *see also* R.C. 3107.07. "[W]hen a child needs a stable family environment and adoption is necessary to meet that need, the statutes require an adoption to proceed expeditiously." *Id.* at ¶ 3, citing *In re Adoption of Zschach*, 75 Ohio St.3d 648, 651 (1996). "To process an adoption expeditiously, a probate court must be able to determine whose consent to the adoption is required *at the earliest point possible in the proceeding*." (Emphasis added.) *Id.* at ¶ 29.

{¶ 15} Adoption typically requires written consent from parents and putative fathers, who "are presumed to have the right to withhold consent to an adoption." *Id*. at ¶ 20. A "parent" is "a legally recognized natural or adoptive parent of a child." R.C. 3107.01(N). A "putative father" is a man, including one under age eighteen, who may be a child's father but is not married to the child's mother at the time of the child's conception or birth; has not adopted the child; has not been determined, *prior to the date a petition to adopt the child is filed*, to have a parent and child relationship with the child by a court proceeding pursuant to sections 3111.01 to 3111.18 of the Revised Code; and has not acknowledged paternity of the child pursuant to sections 3111.21 to 3111.35 of the Revised Code. R.C. 3107.01(S).

{¶ 16} In 1996, the OPFR was established under R.C. 3107.061 et seq. to authorize a man to register with the state if he believed that he may have fathered a child and wanted

6

to be notified if the child was placed for adoption. A man who files with the OPFR demonstrates his intent to claim paternity of a child born out of wedlock and is entitled to receive notice of any proceeding to adopt that child. *Lehr v. Robertson*, 463 U.S. 248, 250-251 (1983). "In general, Ohio's adoption statutes relating to putative fathers are the result of the legislature's effort to balance a biological father's interest in having an opportunity to develop a relationship with his child against the state's interest in protecting the best interests of children." *In re Adoption of H.N.R.*, 2015-Ohio-5476, ¶ 28, citing *Zschach* at 650-651.

{¶ 17} To be considered a father whose written consent is presumed to be required under R.C. 3107.06(A), any one of the following must apply: (1) the minor was conceived or born while the father was married to the mother, (2) the father legally adopted the child, (3) *the father's parent-child relationship was determined through a court or administrative proceeding pursuant to R.C. Chapter 3111 prior to the date the adoption petition was filed*, or (4) the father acknowledged paternity of the child. R.C. 3107.06(A). Likewise, under R.C. 3107.06(B), the putative father of a minor is also required to give his consent.

{¶ 18} A party, however, may overcome the consent presumption by establishing that an exception under R.C. 3107.07 to the consent requirement applies. *H.P.*, 2022-Ohio-4369, at ¶ 20, citing *In re Adoption of P.L.H.*, 2017-Ohio-5824, ¶ 32. "The exceptions that may apply to a parent are set forth in R.C. 3107.07(A) and are different from those that may apply to a putative father under R.C. 3107.07(B)." *Id.* Under R.C. 3107.07(A), for instance, consent to adoption is not required when the parent of a minor "failed without justifiable cause to have more than de minimis contact with the minor or to provide meaningful and regular maintenance and support of the minor as required by law or judicial decree for a period of one year immediately preceding the filing of the adoption petition." R.C. 3107.07(B)(1), on

7

the other hand, provides that a putative father's consent to adoption is not required if "the putative father fails to register as the minor's putative father with the Ohio putative father registry established under section 3107.062 of the Revised Code in accordance with rule 5101:2-48-02 of the Ohio Administrative Code, not later than fifteen days after the minor's birth."

{¶ 19} "'Registering as a putative father is relatively simple. At the time he engages in sexual intercourse, a man is considered to be on notice of the potential biological and ensuing legal consequences of that intercourse. R.C. 3107.061. From that point forward, he can register as a putative father by filling out a short form on a webpage maintained by ODJFS or by mailing the same information to ODJFS.'" *In re Adoption of Z.D.W.*, 2025-Ohio-2465, ¶ 12 (2d Dist.), quoting *H.N.R.*, 2015-Ohio-5476, at ¶ 17. The Revised Code puts putative fathers on further notice that their consent to adoption is unnecessary and warns that "[a] man who has sexual intercourse with a woman is on notice that if a child is born as a result and the man is the putative father, the child may be adopted without his consent" in accordance with R.C. 3107.07(B). R.C. 3107.061.

{¶ 20} Although a putative father has other means of securing the right to notice and to withhold consent, including through judicial paternity proceedings under R.C. 3107.06(A)(3), if he does not do so, his failure to timely register in the OPFR "'precludes him from receiving notice and an opportunity to prove that his consent as a mere putative father should be required for a child's adoption.'" *Z.D.W.* at ¶ 13, quoting *H.N.R.* at ¶ 19, citing R.C. 3107.07(B)(1) and R.C. 3107.11(A)(1); *see also H.P.*, 2022-Ohio-4369, at ¶ 2 ("However, failure to register or to take other required steps in the time and manner prescribed by Ohio's adoption statutes will result in the father's having no say should another person step forward to adopt the child.").

**{¶ 21}** Finally, while related, notice requirements in an adoption proceeding are set forth separately from consent. Notice is not required to be given to a person whose consent is not required as provided in R.C. 3107.07(B), including a putative father who fails to register with the OPFR within 15 days of the minor's birth. R.C. 3107.11(A).

*Motion to Intervene*

**{¶ 22}** A motion to intervene is governed by Civ.R. 24 and is a request to a court asking to be joined as a party to a case. Under Civ.R. 24, there are two types of intervention: intervention of right and permissive intervention. Civ.R. 24(A) and (B). Whether intervention is granted as of right or by permission, we review a trial court's determination under Civ.R. 24 for an abuse of discretion. *In re Adoption of K.*, 2018-Ohio-3082, ¶ 7 (6th Dist.), citing *State ex rel. Merrill v. Ohio Dept. of Natural Resources*, 2011-Ohio-4612, ¶ 41. Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996).

*The Probate Court's Decision*

**{¶ 23}** The probate court engaged in a lengthy analysis that primarily focused on the consent issue and mainly relied on two cases to justify its decision: *In re Adoption of Pushcar*, 2006-Ohio-4572, and *H.P.*, 2022-Ohio-4369. The court indicated that registering as a putative father was not the only means by which a purported father could protect his right to withhold consent in an adoption proceeding. The court pointed out that a purported father could also preserve his right to consent by a judicial determination, and that in this case, according to the juvenile court's March 19, 2025 entry, based on genetic testing, P.H. was in fact the natural father of J.T.S. Upon concluding that parentage had been determined, the court reasoned that although P.H. had failed to register as a putative father, he sought

9

an administrative determination of a father-child relationship by filing a parentage action in the juvenile court nine days before K.S. filed the adoption petition.

{¶ 24} The probate court then considered the timing of P.H.'s filings. The probate court emphasized that under *Pushcar*, when an issue concerning the parentage of a minor is pending in the juvenile court, the probate court must refrain from proceeding with the adoption of that child. The probate court highlighted its understanding of the reasoning underlying this rule; only the juvenile court enjoys the jurisdiction to decide the question of a child's paternity, and until that decision is made, the probate court is unable to determine whether a particular person's consent in an adoption action is required.

{¶ 25} The probate court then distinguished this case from *H.P.* In *H.P.*, the putative father had filed a parentage action in juvenile court after the adoption petition was filed. Based on that timing, the Ohio Supreme Court concluded that the putative father had forfeited his right to withhold consent to the adoption. According to the probate court, the Court's analysis in *H.P.* indicated that prior to the filing of an adoption petition, a putative father need only "take the steps necessary" to establish a parent-child relationship. The probate court noted that in this case, P.H. had filed a parentage action in juvenile court in October 2024, nine days before the adoption petition was filed. The probate court concluded that P.H. had therefore "taken the steps necessary" to establish a father-child relationship prior to the date that the adoption petition was filed. *See* R.C. 3107.06(A)(3) (requiring consent to adoption by person who, prior to the date that the adoption petition was filed, had parentage determined by one of the court proceedings enumerated under the statute).

{¶ 26} The probate court reasoned that although P.H. had failed to timely register with the OPFR, he still had sought to enforce his right to consent by seeking an administrative determination and filing a parentage action in the juvenile court before the filing of the

10

adoption petition. Based on these circumstances, the probate court indicated that under the guidance of *Pushcar,* it had been required to refrain from making any decisions with respect to the adoption petition until the juvenile court adjudicated the parentage issue, which determined whose consent was necessary to proceed with the adoption. Upon the March 2025 parentage adjudication by the juvenile court, the probate court noted that P.H. did in fact have a father-child relationship with J.T.S. based on genetic testing. Given the juvenile court's parentage determination, the probate court concluded that at that stage, P.H. was entitled to notice of the adoption petition and to withhold his consent as J.T.S.'s natural father, notwithstanding the fact that the genetic testing and subsequent parentage determination in the juvenile court had not been rendered until more than four months after the adoption petition was filed.

*In re Application of Pushcar*

{¶ 27} We first turn our attention to *Pushcar*, upon which the probate court relied in justifying its conclusion that the adoption petition had to remain pending until the parentage action in the juvenile court was determined. The probate court surmised that a decision in the parentage action was required to determine what notice and consent were necessary, and that justified its restraint from making an earlier decision on the adoption petition because the parentage issue was still pending.

{¶ 28} The facts of *Pushcar* are worth restating. In *Pushcar*, the natural father signed the birth certificate of the minor child, which registered him as the child's legal father in an out-of-wedlock birth. *Id.*, 2006-Ohio-4572, at ¶ 1. The natural father and mother never married but resided together with the child for almost two years. *Id*.

{¶ 29} Approximately eight months after the natural father and mother separated, they signed an agreement concerning visitation and support of the child. *Id*. at ¶ 2. Eleven

11

months later, a conflict between them arose, which ended their mutual cooperation. *Id*. Shortly thereafter, the child's mother obtained a civil protection order against the natural father. *Id.* at ¶ 3. Nearly five months later, the natural father filed an application with the CSEA to establish his parentage of the minor, but the agency notified him that it could not proceed with his application because he had signed the child's birth certificate and was already considered the child's legal father. *Id*. at ¶ 4. The natural father then filed a complaint with the juvenile court, asking the court to enforce the visitation agreement that he and the mother had agreed to, but the juvenile court informed him that it required genetic testing to establish paternity. *Id*. Hearings regarding the paternity tests were continued. *Id*.

{¶ 30} In the meantime, over a period of about six months, the child's mother married Pushcar, and Pushcar filed a petition in the probate court to adopt the child. *Id*. at ¶ 5. The natural father opposed the adoption petition. A hearing was held to determine whether the natural father's consent to adopt was required under R.C. 3107.07(A), which delineated whose consent was not required for an adoption and included parents who had not provided for or communicated with the child for one year or more. *Id.* Following the hearing, the magistrate found by clear and convincing evidence that the natural father had failed to communicate with the child for one year prior to the filing of the adoption petition and concluded that the natural father's consent was therefore not required for the adoption. *Id*.

{¶ 31} The natural father filed objections to the magistrate's decision, which were overruled by the trial court. *Pushcar*, 2006-Ohio-4572, at ¶ 6. The trial court adopted the magistrate's decision, and the natural father appealed. *Id*. at ¶ 6-7. The Eleventh District acknowledged that the probate court had jurisdiction to consider the petition for adoption but held that the probate court should have refrained from intervening until the juvenile court adjudicated the parenting matter to its conclusion. *Id*. at ¶ 7.

**{¶ 32}** The matter proceeded to the Ohio Supreme Court as a discretionary appeal. *Id*. at ¶ 8. The issue presented for review was whether a probate court must refrain from proceeding with the adoption of a child when an issue concerning the parenting of that child is pending in the juvenile court. *Id*. The Supreme Court held that "when an issue concerning the parenting of a minor child is pending in the juvenile court, a probate court must refrain from proceeding with the adoption of that child." *Id*. at ¶ 10.

**{¶ 33}** It is this conclusion upon which the probate court relied in justifying its decision to allow P.H. to intervene in this adoption matter, ultimately deciding that P.H. was entitled to notice and to withhold his consent—even though P.H. had not timely registered with the OPFR and the existence of a parent and child relationship had not been determined prior to the date the adoption petition was filed. The probate court reasoned that because P.H. had filed a parentage action in the juvenile court nine days before the adoption petition was filed, under *Pushcar*, it had been required to refrain from proceeding with the adoption until the juvenile court adjudicated the parentage issue, which did not occur until more than four months after the adoption petition was filed. We disagree with this application of *Pushcar*. As set forth below, the Ohio Supreme Court has since limited the holding in *Pushcar*, which had required a probate court to always refrain from proceeding with an adoption when there is a pending parentage issue.

**{¶ 34}** It is worth noting that the facts in *Pushcar* are distinctly different from the facts in this case. Unlike P.H., Pushcar signed the minor child's birth certificate and was the child's legal father at the time the adoption petition was filed, and he had had a relationship with the child since birth. P.H. was not J.T.S.'s legal father when the adoption petition was filed. Consent in *Pushcar* was predicated on R.C. 3107.07(A) relating to legal fathers, in contrast to this case that involves consent predicated on R.C. 3107.07(B) relating to putative fathers.

13

**{¶ 35}** Next, the probate court considered *In re Adoption of H.P.* and attempted to distinguish *H.P.* from this case. We, however, find *H.P.* to be instructive in this matter.

**{¶ 36}** In *H.P.*, a married couple filed a petition in the probate court on September 3, 2020, for legal adoption of H.P. (K.W.'s biological child) when H.P. was only three days old. *In re Adoption of H.P.*, 2022-Ohio-4369, at ¶ 5. J.D. gave birth to H.P. when she was 17 years old, planned for H.P.'s adoption, and executed the necessary consent forms filed with the adoption petition. *Id*.

**{¶ 37}** The married couple informed the probate court that they did not believe that the consent of H.P.'s biological father (K.W.) was required but acknowledged that a putative father could still come forward and had until 15 days after H.P.'s birth to do so. *Id*. at ¶ 6. Eventually, no father of the child timely registered with the OPFR. *Id*.

**{¶ 38}** On September 17, 2020, 18-year-old K.W., believing he was the father of H.P., filed an action in the juvenile court seeking custody and genetic paternity testing of H.P. *Id*. at ¶ 7. Six days later, K.W. filed an objection to the adoption in the probate court, informing the court that he believed he was H.P.'s biological father and arguing that J.D. knew he was father and that he did not agree with her plan to place H.P. for adoption. *Id*. The married couple filed a motion to strike K.W.'s objection on the grounds that K.W. was not entitled to object because he did not timely register as a putative father. *Id*.

**{¶ 39}** The probate court scheduled a consent hearing on K.W.'s objection, which was held on January 29, 2021. *H.P.*, 2022-Ohio-4369, at ¶ 8. One day prior to the hearing, K.W. filed a motion to intervene in the adoption proceeding and an additional objection asserting that he was the biological father of H.P. based on a judgment entry in the juvenile court dated January 21, 2021. *Id*. K.W. did not submit a copy of the juvenile court's entry or

a request to stay the adoption proceeding but instead attached copy of a genetic testing report and an administrative order from the CSEA. *Id*. at ¶ 8-9. The probate court acknowledged that it did not have jurisdiction over paternity proceedings. *Id*. at ¶ 10.

**{¶ 40}** At the consent hearing, K.W. testified that he knew that J.D. was due to give birth on September 5 but did not find out about H.P.'s birth until one day past the deadline for registering as a putative father. *Id*. at ¶ 12. He testified that if he had known the registry rules or had known sooner about H.P.'s birth, he would have registered before the deadline. *Id*.

**{¶ 41}** At the conclusion of the hearing, the parties' attorneys and the court engaged in a discussion about whether K.W. fell within the definition of a putative father and ultimately agreed that K.W. met the definition. *Id*. at ¶ 13. The parties also agreed that the juvenile court had issued the January 21 judgment entry setting forth the genetic testing results, which concluded that K.W. was the biological father of H.P. *Id*. at ¶ 14. In his written closing arguments to the probate court, K.W. asserted that he had taken sufficient steps to protect his right to parent H.P., even though he had failed to timely register as a putative father. *Id*. He also asked the probate court to allow him to intervene in the adoption matter and to sustain his objection to the adoption. *Id*.

**{¶ 42}** The probate court determined that under R.C. 3107.07(B), the adoption could proceed without K.W.'s consent because he had failed to register with the putative-father registry within 15 days of H.P.'s birth. *H.P.*, 2022-Ohio-4369, at ¶ 15, citing R.C. 3107.07(B)(1). The probate court found that K.W. "could have registered on the [OPFR] anytime from when he became romantically involved with [J.D.] until 15 days after the birth of the child on August 31, 2020," and that had he done so, his rights would have been protected. *Id*. While the probate court sympathized with K.W., it found that the legislature's

15

deadline under R.C. 3107.07(B) promoted the goal of giving certainty to families who want to adopt a child. *Id*. K.W. appealed the probate court's judgment. *Id*.

{¶ 43} On appeal, though K.W. admitted that he was a putative father, he asserted that the probate court erred in finding that his consent to the adoption was not required under R.C. 3107.07(B), which applied only to putative fathers, because at the time of the consent hearing on January 29, 2021, he had been determined to be H.P.'s legal father based on genetic testing. *Id*. at ¶ 16. K.W. argued that based on *Pushcar*, the adoption should not have proceeded in the probate court when a parenting action regarding the child was pending in a juvenile court. *Id*. He contended that once he filed his custody case in the juvenile court, the probate court was required to stay the adoption proceeding. *Id*. The married couple and J.D. filed a joint brief in opposition, arguing that K.W. had not established his right to withhold his consent to the adoption as either a legal father or a putative father. *Id*. at ¶ 17. They argued that K.W.'s reliance on *Pushcar* was erroneous because *Pushcar* required a probate court to stay an adoption proceeding only when a paternity action had been filed in a juvenile court *prior to* the filing of the adoption petition. *Id*.

{¶ 44} The Third District held that there was no question that K.W. was a putative father at the time the adoption petition was filed and that he had not registered with the putative-father registry within 15 days of H.P.'s birth. *Id*. at ¶ 18. The appellate court concluded that the probate court was therefore correct in determining that K.W.'s consent to the adoption was not necessary as a mere putative father but decided that K.W. had a "second status" as the biological father of H.P. *Id*. The court determined that the probate court should have considered whether K.W.'s consent—"as the legal father with all of the rights and responsibilities that entails"—was necessary under R.C. 3107.07(A). *Id*. The appellate court remanded the matter to the probate court for it to conduct that analysis. *Id.*

The married couple and J.D. appealed, and the Ohio Supreme Court accepted the appeals for discretionary review. *Id*. at ¶ 19.

{¶ 45} On review, the Supreme Court stated that the probate court's consent determination could not have been made at the time the adoption petition was filed because, on that date, the 15-day-post-birth window for any man to register as H.P.'s putative father had not expired. *H.P.*, 2022-Ohio-4369, at ¶ 22. The Court went on to explain, however, that

> once the 15-day window expired and [the married couple] filed the certificate showing that no one had registered as H.P.'s putative father, K.W. had no right to object to the adoption. At that point, K.W. did not have a right to receive notice that the adoption petition had been filed, *see* R.C. 3107.11(A)(1), let alone a right to object to it, and K.W.'s legal endeavor to be a parent to H.P. came to an end, *see* R.C. 3107.07(B)(1); *In re Adoption of H.N.R.*, 145 Ohio St.3d 144, 2015-Ohio-5476, 47 N.E.3d 803, ¶ 19 (explaining that failure to satisfy any one of the statutory conditions "brings the putative-father process to an end").

*Id*. at ¶ 23.

{¶ 46} The Supreme Court also disagreed with K.W.'s argument that even if his consent was not required as a putative father, by the time the probate court conducted the consent hearing, he was no longer a putative father but was, rather, a legal father for consent purposes, and thus had the right to object as H.P.'s biological father. *Id*. at ¶ 24-25. Observing that there was merely a stipulation in the probate court record that genetic-testing results indicated that K.W. was H.P.'s biological father and there was no judicial determination, the Court concluded that the genetic-testing results were of no consequence

17

because they were obtained *after* the adoption petition had been filed. *Id*. at ¶ 26. The Court stated:

> In addition to registering as a putative father, K.W. could have protected his right for his consent to the adoption to be necessary by initiating an administrative or court proceeding under R.C. Chapter 3111 to establish his legal rights to parent H.P. *See* R.C. 3107.06(B)(3). He could have done this at any time, even prior to the child's birth. *See* R.C. 3111.04(C). However, for purposes of preserving his right that his consent to any adoption be necessary, K.W. *was required to take these steps "prior to the date the [adoption] petition was filed*," R.C. 3107.06(B)(3).

(Emphasis added.) *Id*. at ¶ 27.

{¶ 47} In the instant matter, to justify granting P.H.'s motion to intervene and finding that P.H. was entitled to notice and to withhold his consent, the probate court relied on *H.P.*'s indication that K.W. had been required to *take steps to establish parentage prior to the date the adoption petition was filed*. The probate court opined that P.H. had filed his motion to intervene in April 2025 not as J.T.S.'s putative father, but as his biological father after genetic testing had confirmed his paternity and after the juvenile court had made a judicial determination of his parentage in March 2025. The probate court reasoned that P.H. had sought to establish parentage in October 2024, nine days before the adoption petition was filed, and thus his right to consent as a legal father existed by way of a judicial determination in the juvenile court under R.C. 3107.06(A)(3), rather than as a putative father under R.C. 3107.06(B). The court deduced that for the purpose of preserving the right to consent and rendering consent necessary, P.H. had been required merely to *take the steps* for a judicial determination of parentage prior to the date the adoption petition was filed, which he

18

had done. The probate court's attempt to distinguish *H.P.* from the circumstances in this case centered on the fact that unlike the putative father in *H.P.*, P.H. had sought to establish his parentage by a judicial determination via filing a complaint for parentage nine days *before* the adoption petition was filed, which the probate court deemed sufficient.

### K.S.'s Sole Assignment of Error

{¶ 48} In his assignment of error, K.S. contends that the probate court erred as a matter of law when it determined that P.H. was entitled to both notice of the petition for adoption and to withhold his consent because (1) P.H. failed to register as a putative father within 15 days of J.T.S.'s birth, as required by R.C. 3107.07(B)(1) and (2) it was not determined prior to the date the petition was filed that a parent and child relationship existed, as set forth in R.C. 3107.06(A)(3).

{¶ 49} K.S. argues that the statutory language and the case law retreating from the broad reading of *Pushcar,* as applied to this case, required a determination not only that P.H. lost his rights as putative father for failing to timely register in the OPFR, but also that he could not revive his parental rights after waiting more than five years from J.T.S.'s birth before filing a complaint for parentage in the juvenile court and then filing his complaint just nine days before the filing of the adoption petition. Upon our review, we agree.

### Analysis

{¶ 50} We acknowledge that "natural parents have a fundamental right to the care and custody of their children." *Pushcar*, 2006-Ohio-4572, at ¶ 11, citing *In re Adoption of Masa*, 23 Ohio St.3d 163, 165 (1986), citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Because adoption terminates those fundamental rights, any exception to the requirement of parental consent to adoption must be strictly construed." *Id*. While any exception to the consent requirements for adoption must be construed in favor of protecting the natural

parent's right to parent his child, we apply the statute as written when the language of the statute is clear, as it is here. *H.P.*, 2022-Ohio-4369, at ¶ 3, citing *P.L.H.*, 2017-Ohio-5824, at ¶ 23, and *Gabbard v. Madison Local School Dist. Bd. of Edn.*, 2021-Ohio-2067, ¶ 13.

{¶ 51} The plain language of R.C. 3107.06(B) provides that the putative father of a minor is required to provide his consent to adoption. However, a putative father's consent is unnecessary under R.C. 3107.07(B)(1) if he fails to register as the minor's putative father with the OPFR not later than 15 days after the minor's birth. Similarly, the plain language of R.C. 3107.06(A)(3) provides that to be considered a father whose written consent is presumed to be required in an adoption, a parentage action in a court proceeding establishing that a parent-child relationship existed must be determined "*prior to the date the [adoption] petition was filed.*"

{¶ 52} In the instant matter, once the juvenile court determined that based on paternity testing, P.H. had a parent-child relationship with J.T.S., the probate court concluded that P.H. was entitled to notice of the adoption petition and to withhold his consent pending further consideration of the circumstances in R.C. 3101.07, even though the juvenile court did not render its parentage determination until more than four months after the adoption petition was filed. We disagree with the probate court's conclusion.

{¶ 53} First, it is undisputed that P.H. met the definition of a putative father when the adoption petition was filed. He was never married to mother, never adopted J.T.S., never acknowledged paternity by filing an affidavit with the appropriate agency, and never established that a parent-child relationship with J.T.S. existed *prior to the date the adoption petition was filed*. It is also undisputed that P.H. failed to register with the OPFR within 15 days of J.T.S.'s birth. R.C. 3107.07(B)(1). "[U]nder Ohio's statutory scheme, putative fathers need not have notice of a birth or even a pregnancy to have their rights foreclosed*." In re*

20

*Adoption of B.M.M.*, 2024-Ohio-2288, ¶ 15 (2d Dist.), quoting *In re Adoption of Z.G.A.*, 2016-Ohio-238, ¶ 20 (2d Dist.). A man has notice that if a child is born as a result of his having sexual intercourse with a woman and he is a putative father, the child may be adopted without his consent. R.C. 3107.061. Thus, even if P.H. believed that mother had aborted J.T.S. based on rumors that he had heard, he was still on notice of his potential putative father status and was precluded under Ohio law from maintaining his right to consent while sitting on his rights for more than five years as an unregistered putative father. P.H. could have registered in the OPFR at any time between when he became romantically involved with mother and 15 days after the birth of J.T.S. Had he done so, his rights with respect to the adoption proceeding would have been preserved.

{¶ 54} Next, the Ohio Supreme Court's decision *In re Adoption of M.G.B.-E.*, 2018-Ohio-1787, narrowed the holding of *Pushcar*. In *M.G.B.-E.*, the father of the minor in the adoption proceeding asked the Court to hold broadly that a probate court "may not proceed with an adoption petition if any pending parenting matter is proceeding in another court." *Id.* at ¶ 1. The Court rejected the father's proposition of law, holding "more narrowly that a probate court *must merely consider the existence of pending parenting matters when determining whether an exception to the requirement of parental consent to adoption applies*." *Id*. The Court explained that "when a parenting issue pending in a juvenile or domestic-relations court does not affect a probate court's *ability* to determine the statutory prerequisites for adoption, we have not required the probate court to refrain from exercising its exclusive jurisdiction over adoption proceedings." *Id*. at ¶ 35.

{¶ 55} Based on this reasoning, we do not believe that the probate court was obligated to stay the adoption proceeding pending the outcome of the parentage matter in the juvenile court, particularly when P.H. had waited more than five-and-a-half years to seek

21

to establish parentage and the parentage action was filed only nine days prior to the adoption petition. Moreover, the probate court was able to determine, without any finding by the juvenile court, whether P.H. had registered with the OPFR, which he had failed to do, thereby rendering his consent unnecessary under R.C. 3707.07(B)(1). *See M.G.B.-E.* at ¶ 36. In this case, the probate court had the *ability* to make notice and consent determinations at the time the adoption petition was filed—even though P.H. had a pending complaint for parentage in the juvenile court—because when the adoption petition was filed, P.H. was merely a putative father who had never registered with the OPFR.

**{¶ 56}** To further guide us, we are also persuaded by the following reasoning from the dissent in *In re Adoption of G.V.*, 2010-Ohio-3349:

The definition of "putative father" specifically provides that a man is a putative father if "[h]e has not been determined, *prior to the date a petition to adopt the child is filed,* to have a parent and child relationship" with the child through a court or administrative proceeding. (Emphasis added.) R.C. 3107.01(H). Similarly, the definition of "father" under R.C. 3107.06(B)(3) provides that to establish a parent-child relationship through court or administrative proceedings, the court or administrative determination must be completed "[p]rior to the date the [adoption] petition was filed." In other words, when an adoption petition is filed, the statutes require the status of the parties involved to be ascertained *at that time*.

The statutes are absolutely clear that the child may be adopted without a putative father's consent when he fails to register with the Putative Father Registry or to establish a parent-child relationship through one of the judicial or administrative means set forth in R.C. 3107.06(B) before the adoption

22

petition is filed. The statutes also are absolutely clear that consent is required from a putative father who timely registers with the Putative Father Registry unless the exception set forth in R.C. 3107.07(B)(2) applies. *Nothing in the adoption statutes provides for a stay of the adoption proceedings to allow for the filing of or completion of pending actions to establish paternity*.

(Emphasis added.) *Id.* at ¶ 18-19 (Brown, C.J., dissenting).

{¶ 57} Here, because P.H. failed to register as a putative father within the required time, any argument that the probate court could not determine his "status" for consent purposes is without merit. *See H.P.*, 2022-Ohio-4369, at ¶ 21. Although a hearing might be required for adoption petitioners to demonstrate any exceptions to the consent requirement under R.C. 3107.07(B)(2), no hearing is necessary to determine whether a putative father has properly registered. *See id*. Thus, we do not believe that the holding in *Pushcar* required the probate court to stay the adoption proceeding for a parentage action filed just nine days before the adoption petition when the existence of a parent and child relationship had not yet been determined. When P.H. filed his adoption petition, the probate court was able to determine whether a putative father whose consent was necessary existed. Therefore, the probate court's notice and consent determinations should have been made at the time. We agree with K.S. that the plain language of R.C. 3107.062, 3107.06(B), and 3107.07(B)(1), taken together, dictates that a putative father, like P.H., who has not registered with the OPFR within 15 days of the child's birth loses his rights both to notice of a petition for adoption and to withhold his consent.

{¶ 58} Further still, we want to emphasize that the natural father in *Pushcar* signed the birth certificate of the minor child, which registered him as the child's legal father in an out-of-wedlock birth, and the natural father and mother resided together with the child for

23

almost two years. Upon their separation, the natural father and mother signed an agreement concerning visitation and support of the child, and the natural father promptly took action to enforce the agreement when a conflict later arose between him and the mother. Unlike P.H., the natural father in *Pushcar* had significant custodial, personal, and financial relationships with the minor—factors that the United States Supreme Court identified in *Lehr v. Robertson* as important to determining whether a putative father has had an opportunity to develop a relationship with his child warranting constitutional protection. *See id.*, 463 U.S. at 262.

{¶ 59} Much of the analysis in *Lehr* centered on due process. The Fourteenth Amendment of the United States Constitution provides that no state shall deprive any person of life, liberty, or property without due process of law, and Article I, Section 16 of the Ohio Constitution guarantees the same. Several cases, like *Lehr*, have considered the extent to which the Constitution affords protection to the relationship between natural parents and children born out of wedlock, specifically including a putative father's right to due process in the context of adoption. In *Lehr*, the Supreme Court explained:

> When an unwed father demonstrates a full commitment to the responsibilities
> of parenthood by "com[ing] forward to participate in the rearing of his child,"
> *Caban*, 441 U.S., at 392, 99 S.Ct., at 1768, his interest in personal contact with
> his child acquires substantial protection under the due process clause. At that
> point it may be said that he "act[s] as a father toward his children." *Id.*, at 389,
> n. 7, 99 S.Ct., at 1766, n. 7. But the mere existence of a biological link does
> not merit equivalent constitutional protection. The actions of judges neither
> create nor sever genetic bonds. "[T]he importance of the familial relationship,
> to the individuals involved and to the society, stems from the emotional
> attachments that derive from the intimacy of daily association, and from the

role it plays in 'promot[ing] a way of life' through the instruction of children as well as from the fact of blood relationship." *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109-2110, 53 L.Ed.2d 14 (1977) (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 231-233, 92 S.Ct. 1526, 1541-1542, 32 L.Ed.2d 15 (1972)).

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Lehr* at 261-262.

{¶ 60} The *Lehr* court clarified that a putative father must demonstrate full commitment to the responsibilities of parenthood to gain substantial protection under the due process clause. In this case, we want to stress that over a period of more than five years, and unlike the natural father in *Pushcar*, P.H. never made any effort to develop a relationship with J.T.S. as described in *Lehr*. P.H. never fostered significant custodial, personal, or financial relationships with J.T.S. The factors identified in *Lehr* were not applicable to P.H., and no due process concerns are presented here.

{¶ 61} In addition to registering as a putative father, P.H. could have protected his right to consent by initiating a timely administrative or court proceeding under R.C. Chapter 3111 to establish his legal rights to parent J.T.S. *H.P.*, 2022-Ohio-4369, at ¶ 27; *see* R.C. 3107.06(A)(3). "[P.H.] could have done this at any time, even prior to the child's birth." *Id.,*

25

citing R.C. 3111.04(C). But for purposes of preserving his right that his consent to any adoption be necessary, P.H. was required to demonstrate that a parent and child relationship existed by way of a judicial determination *prior* to the date the petition was filed. R.C. 3107.06(A)(3).

{¶ 62} The probate court's application of *Pushcar* in this case ignored the statutory language in R.C. 3107.06(A)(3) requiring that "[p]rior to the date the [adoption] petition was filed, it was determined by a court proceeding . . . that a parent and child relationship exists." *See H.P.* at ¶ 37. As the Ohio Supreme Court stated in *H.P.*, "that language is critical to the effective functioning of the adoption statutes, and it obviously has significant meaning, as it draws a bright line between when a parent's consent to adoption is required and when it is not." *Id*. The legislature could have specified a different time frame within which a father must establish paternity under R.C. 3107.06(A)(3), but it specifically used the words "prior to the date" regarding the filing of the adoption petition. *Id*. Like the Court in *H.P.*, we must give the language the effect that was intended. *Id*. If the legislature intended that a purported father merely had to file an action to establish parentage prior to the date of the petition, it could have said so.

{¶ 63} Here, there was no question that in accordance with R.C. 3107.06(A)(3), there had been no judicial *determination* that a parent-child relationship existed between P.H. and J.T.S. *prior to the date the adoption petition was filed*, which would have warranted P.H.'s consent. We recognize that P.H. filed his complaint for parentage on October 29, 2024, nine days before the petition for adoption was filed by K.S. Even though a judicial determination regarding P.H.'s paternity was ultimately made more than four months later in March 2025 (after the adoption petition was filed and the paternity results were obtained), there was no need for the probate court to wait for the juvenile court to make a judicial

26

determination on P.H.'s parentage complaint. As explained in *H.P.*, the genetic testing results were of no consequence because the results were obtained after the adoption petition had been filed. Under these circumstances, at the time the adoption petition was filed, P.H. could not have been considered a legal father to J.T.S. under the plain language of R.C. 3107.06(A)(3), and his consent to the adoption was not necessary as a mere putative father. *See H.P.* at ¶ 18; R.C. 3107.06(A)(3) and 3107.07.

{¶ 64} Finally, in a case like this one, when P.H. had not registered in the OPFR and no judicial or agency determination regarding the existence of a parent-child relationship had been made prior to the filing of an adoption petition, the statutes did not provide a mechanism to revive P.H.'s parental rights. Despite this, P.H. sought to change his status in the adoption proceeding from putative father to natural father based on a parentage finding made after the adoption petition was filed. The probate court agreed with P.H. and found that the adoption proceeding had to be stayed pending completion of the juvenile court paternity proceedings; that the juvenile court's finding of paternity had to be recognized by the probate court; and that P.H.'s new status as natural father rather than putative father required P.H.'s consent under R.C. 3107.06(A)(3).

{¶ 65} We note that the *H.P.* court, in dicta, stated that while it had envisioned the possibility that a father might revive his right for his consent to an adoption to be necessary by establishing his paternity after he had failed to timely register as a putative father, there was no precedent for a rights-reviving paternity action that could occur after an adoption proceeding was already underway. *H.P.*, 2022-Ohio-4369, at ¶ 30. The Court stated that to permit a purported father to change his status for consent purposes (e.g. from putative father to legal father) "would not only ignore the time limitations set forth in the relevant statutes, *see* R.C. 3107.062 and 3107.07(B)(1), but also 'would leave the rights of the parties to a

27

pending adoption in a state of uncertainty and would impede the adoption process that had already begun.'" *Id.* at ¶ 29, quoting *H.N.R.*, 2015-Ohio-5476, at ¶ 30. In *H.N.R.*, a father had obtained genetic-testing results indicating that he was the father of H.N.R., but the father had failed to timely register with the putative-father registry. *H.N.R.* at ¶ 3-4. Like the natural father in *H.P.*, the father in *H.N.R.* sought custody of the child but not until after the petition for adoption had been filed. *Id.* at ¶ 6. The probate court in *H.N.R.* determined that the father's consent was unnecessary because he had made no effort to protect that right until after the petition for adoption had been filed. *Id.* at ¶ 12.

{¶ 66} In consideration of the foregoing, we cannot say that P.H. successfully revived his notice and consent rights in this matter by changing his status from putative father to legal father simply because he filed an action for a judicial determination of parentage nine days before the adoption petition was filed and more than five years after J.T.S. was born. Permitting P.H. to change his status from putative father to legal father ignored the time limitations in R.C. 3107.06(A)(3) and 3107.07(B)(1) and left the rights in the pending adoption proceeding in a state of uncertainty when the notice and consent determinations could have already been made. "Staying the probate court's adoption proceedings for a juvenile court proceeding to establish paternity is inappropriate in light of the clear directive of the adoption statutes and unnecessarily delays adoption proceedings contrary to the intent of the General Assembly." *G.V.*, 2010-Ohio-3349, at ¶ 28 (Brown, C.J., dissenting). Therefore, the probate court's failure to apply the unambiguous language in the relevant adoption statutes and its erroneous reliance on *Pushcar* contravened the express adoption policy established by the legislature.

{¶ 67} In conclusion, when K.S. filed the adoption petition, more than five years had passed since J.T.S.'s birth, P.H. had not established a parent-child relationship with J.T.S.,

and the 15-day-post-birth window for him to register as J.T.S.'s putative father had long expired. Once the 15-day window had expired for P.H. to register as J.T.S.'s putative father, P.H. did not have a right to receive notice that the adoption petition had been filed, let alone a right to object to it, and his legal endeavor to be a parent to J.T.S. came to an end. *See H.P.* at ¶ 23, citing R.C. 3107.11(A)(1); *see also* R.C. 3107(B)(1). Although P.H. filed a parentage action in the juvenile court nine days before the adoption petition was filed, the parentage action, establishing that a parent and child relationship between him and J.T.S. existed, had not been *determined* prior to the date the petition was filed. For these reasons, P.H. was not entitled to notice of the adoption or to withhold his consent. We conclude that the probate court abused its discretion when it granted P.H.'s motion to intervene in this adoption. Therefore, K.S.'s sole assignment of error is sustained.

### III. Conclusion

{¶ 68} Having sustained K.S.'s assignment of error, the judgment of the probate court is reversed, and this matter is remanded for a final hearing on the adoption.

. . . . . . . . . . . . .

EPLEY, J., and HANSEMAN, J., concur.